No. 26-1832

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

AFRICAN COMMUNITIES TOGETHER; PARTNERSHIP FOR THE
ADVANCEMENT OF NEW AMERICANS; ALEXANDER DOE; MOHAMED
DOE; TYSON DOE; AND NINA DOE,

*Plaintiffs-Appellees*,

v.

MARKWAYNE MULLIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; AND
UNITED STATES OF AMERICA,

*Defendants-Appellants*,

_____

On Appeal from an Order of the United States District Court for the District of
Massachusetts (Burroughs, J.) in No. 1:26-cv-11201-ADB

_____

**APPELLEES' RESPONSE IN OPPOSITION TO APPELLANTS' MOTION
FOR SUMMARY REVERSAL AND ALTERNATIVE MANDAMUS
PETITION**

1

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………….3

BACKGROUND…………………………………………………………………...4

ARGUMENT……………………………………………………………………7

I.     THIS COURT LACKS INTERLOCUTORY JURISIDCTION AND SUMMARY REVERSAL IS NEVERTHELESS UNWARRANTED…….....................................................................8

   a.   Appellants Fail to Establish Appellate Jurisdiction…………....................9

   b.   The Unresolved Jurisdictional, Procedural, and Merits Questions in This Case Preclude Summary Reversal………......................................................12

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN TEMPORARILY MAINTAINING THE ADMINISTRATIVE STAY TO PREVENT IRREPARABLE HARMS TO APPELLES WHILE RESOLVING THE LIVE ISSUES THAT REMAIN AFTER MULLIN….......................................................................................15

   a.   The Record Reflects the District Court's Diligent and Expeditious Exercise of its Docket-Management Authority........................................................16

   b.   Maintaining the Status Quo Prevents Irreparable Harm While the District Court Completes its Expedited Review…...................................................20

III.   MANDAMUS IS AN EXTRAORDINARY REMEDY THAT THE GOVERNMENT ENTIRELY FAILS TO JUSTIFY……………………..23

CONCLUSION………………………………………………………………...26

CERTIFICATE OF COMPLIANCE……………………………………............29

CERTIFICATE OF SERVICE……………….....................................................30

EXHIBITS…………………………………………………………………..31

**INTRODUCTION**

Appellants ask this Court to summarily reverse an administrative stay while the district court is actively adjudicating Appellees' pending request for interim relief—or, alternatively, to issue mandamus directing the district court to reach Appellants' preferred result. Neither extraordinary remedy is available. The government's motion rests on a distorted account of the proceedings below. The district court initially preserved the status quo before Appellants had appeared, produced the administrative record, or responded to Appellees' emergency motion. After briefing was completed, both parties agreed that proceedings could appropriately await the Supreme Court's decision in *Mullin v. Doe*. When *Mullin* issued, the district court promptly lifted the abeyance, directed the parties to identify the claims and issues that remained, and established an expedited supplemental briefing schedule. The district court's preservation of the status quo is appropriate here: otherwise, thousands of Somali TPS beneficiaries and applicants would be immediately stripped of their status and attendant benefits before ever having their day in court.

Appellants repeatedly equate a refusal to rule immediately with a refusal to rule at all. But the district court has not declined to exercise jurisdiction or left the matter dormant. It is actively determining how *Mullin* applies to Appellees' Somalia-specific constitutional claim—a claim the Supreme Court did not hold unreviewable

3

and did not decide on this factual record (in addition, the district court has sought briefing on new claims Appellees will present in an amended complaint to be filed imminently).

This Court lacks interlocutory jurisdiction over the temporary administrative order. Even if jurisdiction existed, the unsettled jurisdictional, procedural, and merits questions presented here foreclose summary reversal. And mandamus is unavailable because the district court is actively adjudicating the dispute and Appellants cannot establish a clear and indisputable right to immediate dissolution of the stay.

## BACKGROUND

Following the collapse of its military dictatorship and the onset of a devastating civil war, Somalia was initially designated for TPS in 1991. Designation of Somalia for Temporary Protected Status, 56 Fed. Reg. 48804 (Sep. 16, 1991). Over the past nearly three decades, its TPS designation has been consistently extended or redesignated. The most recent redesignations in 2023 and 2024 noted dire conditions, including ongoing attacks between government forces and terrorist groups leading to civilian deaths; lack of healthcare infrastructure amidst a cholera outbreak; food insecurity and malnutrition; and gender-based violence and human rights violations. President Trump recognized the harsh conditions in Somalia in a series of social media posts in November 2025, wherein he described Somalia as "devastated" and "[n]ot even a country for lack of Government, Military, Police,

schools, etc."[1] Two months later, Appellants issued a Federal Register notice purporting to terminate TPS status for Somalia, effective March 17, 2026. 91 Fed. Reg. 1547 (Jan. 14, 2026).

On March 9, 2026, Appellees—four Somali TPS beneficiaries and two organizations that serve Somali TPS holders and applicants—filed this suit, moved for an emergency postponement of the Termination, and sought an administrative stay to prevent irreparable harms pending production of the administrative record and motion for postponement. Dkt. 3 at 2. By March 13, Appellants had not yet appeared and had not yet produced the administrative record. Given the posture and the impending effective date of the Termination, the district court entered an administrative stay to preserve the status quo until it could rule on the merits after full briefing and production of the administrative record. Dkt. 33 at 2–4. The district court's administrative stay order recognized the "weighty" interests of Appellees and noted its expectation that the parties "establish and comply with a prompt briefing schedule with the goal of resolving [Appellees'] emergency motion for preliminary relief as quickly as possible." *Id.* at 2–3. Five days into the administrative stay, the parties jointly proposed a briefing schedule and noted their availability for a hearing on Appellees' motion the week of May 4, 2026. The district

---

[1] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

court quickly entered an order adopting the parties' joint proposed briefing schedule and scheduled a hearing for May 4. Dkt. 40; *see also* Dkt. 35. Following production of the administrative record, Appellees filed a motion to compel seeking production of redacted material. *See* Dkt. 65.

Before the pending motions could be resolved, and five days before the May 4, 2026, arguments scheduled on Appellees' motion, the Supreme Court heard argument in *Mullin v. Doe*, Nos. 25-1083 & 25-1083 (U.S. Mar. 16, 2026). The following day, the district court requested the parties' position on a proposed stay of proceedings pending a decision in *Mullin*. Dkt. 70. Appellees noted they did not oppose staying proceedings provided that the administrative stay of the Termination remained in place and proposed that the parties submit a joint status report fourteen days after the Supreme Court's decision in *Mullin. See* Dkt. 71. The government did not oppose a stay. *See* Dkt. 72. Per the parties' agreement, the district court entered an order staying proceedings and maintaining the administrative stay and adopted Appellees' proposal for a joint status report. Dkt. 73.

On June 25, 2026, the Supreme Court issued its decision in *Mullin*, *see* 609 U.S. —, 2026 WL 1825840 (U.S. June 25, 2026). Contravening its previous position regarding the stay and circumventing the district court's prior order instructing the parties to file a joint status report fourteen days after *Mullin*, on July 1, 2026, the government filed a motion asking the district court to lift the abeyance and the

administrative stay. Dkt. 77. The next day, the district court lifted the abeyance but preserved the administrative stay. Dkt. 78. Seven days later, on July 9, the parties submitted a joint status report, *see* Dkt. 79. In it, Appellees notified the Court of their intent to file an amended complaint raising new claims and to file a renewed motion for postponement based on their pre-existing Equal Protection claim as well as new claims. *See id.* at 3. In view of Appellees' stated intent, the district court issued an order setting a briefing schedule for supplemental briefing, due by July 30, with Appellants' response due by August 13, and permitting Appellees an opportunity to reply within 7 days of the filing of Appellants' brief. Dkt. 82. Over a week after the district court set this briefing schedule, the government filed the present motion in this Court seeking summary reversal or in the alternative, mandamus relief.

## ARGUMENT

Several issues undermine the government's rash request for summary reversal, or alternatively a mandamus petition, to dissolve the administrative stay.

First, Appellants' motion fails at the threshold because the administrative stay is not an appealable order. Even if jurisdiction existed, summary reversal is an extraordinary remedy and Appellants fail to meet their high burden in showing it is warranted where the merits are contested and Appellants' central premise—that *Mullin* precludes any of the relief Appellants seek—has not yet been analyzed by the district court.

Second, the district court has not refused to rule on the merits post-*Mullin,* nor is the administrative stay it ordered an abuse of discretion: the district court promptly lifted the stay of proceedings and ordered a briefing schedule, while preserving the status quo pending its resolution of Appellees' motion. This is precisely the purpose of an administrative stay.

Third, the government's request for mandamus relief fares no better for the same reasons and because Appellants cannot show the clear and indisputable entitlement that such an extraordinary remedy requires. The government's motion should be denied to ensure the status quo is maintained while the district court resolves Appellees' request for postponement.

## I.    This Court Lacks Interlocutory Jurisdiction and Summary Reversal Is Nevertheless Unwarranted.

This Court does not have jurisdiction over the order being appealed because the district court's administrative stay order does not have the practical effect of granting an injunction, Appellants do not face irreparable harm absent immediate appeal, and Appellants will have the opportunity to appeal the district court's forthcoming postponement order. Even if jurisdiction existed, summary reversal is not warranted here because Appellants' motion raises several unsettled questions that are not ripe for decision.

### A. Appellants Fail to Establish Appellate Jurisdiction.

The district court's administrative stay order is not an appealable interlocutory order. To establish appellate jurisdiction, Appellants must show that the administrative stay has the practical effect of granting an injunction, creates a "serious, perhaps irreparable, consequence," and can only be "effectually challenged" by immediate appeal. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981). Appellants fail to meet any of these three requirements; therefore, this Court does not have jurisdiction.

First, the administrative stay does not have the practical effect of granting an injunction because it was not originally entered "after adversarial briefing and a hearing," *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025), and because "further interlocutory relief is available in the absence of immediate review," *Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020), in the form of the forthcoming postponement order, *cf. Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno*, 582 F.3d 131, 134 (1st Cir. 2009). Here, the administrative stay was originally entered to permit adversarial briefing on Appellees' motion. It was recently extended prior to receiving the parties' supplemental briefing on the impact of *Mullin* in addition to new claims presented by Appellees' forthcoming amended complaint (themselves providing a sufficient basis for the relief Appellees seek). Moreover, the district court "did not claim to

9

deny" Appellants' ultimate requested relief—that the Termination take effect—nor did it "discuss the merits in any way that would indicate [such relief] was foreclosed." *Id.* Instead, the district court made clear that the purpose of the administrative stay was to "clear the way for a definitive, reviewable ruling," *id.*, on Appellees' postponement motion, Dkt. 78, Mot. Ex. 3. While Appellants seek to reduce the analysis down to a simple counting of days, *see* Appellants' Mot. ("Mot.") at 9 (stating courts permit review of temporary restraining orders that go beyond 28 days), context is everything and the length of time the administrative stay in this case has remained in place is reasonable in light of the context. *See Almeida-Leon v. WM Cap. Mgmt., Inc.*, No. 20-2089, 2024 WL 2904077, at *4 (1st Cir. June 10, 2024) (no appellate jurisdiction over temporary restraining order without a defined duration where context made clear the order was extended to allow for briefing on pending motion).

Second, Appellants do not argue that they will face a "serious, perhaps irreparable, consequence" without immediate appellate review—they would not. The administrative stay order merely maintains the status quo that has been in place for thirty-five years and Appellants provide no specifics on what irreparable consequence would befall them if this status quo remains in place until the district court issues its immediately appealable postponement order after briefing is completed in less than a month. *Cf. Providence J. Co. v. Fed. Bureau of*

10

*Investigation*, 595 F.2d 889, 890 (1st Cir. 1979) (noting that destruction of status quo would constitute irreparable harm). Indeed, the difference between the date when Appellants request a ruling from this Court (August 6), and the date when current briefing before the district court will be complete (August 20) is almost negligible; meanwhile, the risk of irreparable harm to Appellees is substantial.

Finally, Appellants have not "demonstrated that effective appellate review of the constitutionality" and overall lawfulness of the termination of Somalia's TPS designation "will be thwarted if . . . confined to traditional litigation channels." *Calvary Chapel*, 984 F.3d at 29. To the contrary, Appellants may appeal the district court's interlocutory postponement order if it is issued. *Id.* And, because Appellants have not pointed to any irreparable consequence,[2] there is no concern that any such consequence could only be obviated by an immediate appeal of an otherwise unappealable order. *See Carson*, 450 U.S. at 90.

**B. The Unresolved Jurisdictional, Procedural, and Merits Questions in This Case Preclude Summary Reversal.**

Even if this Court did have jurisdiction, the facts here clearly do not warrant summary reversal. Summary reversal is an extraordinary remedy, reserved for the

---

[2] Appellants indicated to the court on May 1 that "they do not oppose a stay of this litigation pending a decision of the Supreme Court in <u>Mullin v. Doe</u>, No. 25-1083, and <u>Trump v. Miot</u>, No. 25-1084." Dkt. 72. The Supreme Court issued its joint decision on those cases on June 25, 2026, and Appellants filed their motion to lift the abeyance and the administrative stay on July 1, 8 weeks and 5 days later.

limited case where a party has met "the heavy burden of demonstrating both that his remedy is proper and that the merits of his claim so clearly warrant relief as to justify expedited action." *United States v. Allen*, 408 F.2d 1287, 1288 (D.C. Cir. 1969); *see also United States v. Fortner*, 455 F. 3d 752, 754 (7th Cir. 2006) (per curiam) (holding that summary reversal is limited to circumstances where a recent appellate decision directly resolves the appeal). Requests for summary reversal should be fully briefed and "ripe for decision," such that it is "unlikely to turn significantly on fact findings or further legal researches." *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 832 (D.C. Cir. 1972); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987).

Appellants have failed to meet that high threshold. To start, Appellants themselves acknowledge uncertainty as to this Court's jurisdiction by requesting mandamus as an alternative to summary reversal. Even more, Appellants acknowledge that the "law governing administrative stays" is "unclear." Mot. at 21.

Additionally, Appellants' motion raises several unsettled questions about the proper effect of *Mullin* as applied to the specific facts of this case and to Appellees' forthcoming amended complaint and renewed motion for relief. *Mullin* does not compel summary rejection of Somalia's specific equal protection claim nor the new claims that will be presented. *See Aung Doe v. Mullin,* No. 25-cv-15483, 2026 WL 1983721 (N.D. Ill. July 9, 2026) (rejecting the government's argument that *Mullin*

12

counseled against permitting plaintiffs Burmese TPS holders to pursue discovery on their equal protection claim).

Here, Appellees' equal protection claim concerns a different country, a different termination decision, and a different administrative record than in *Mullin*.[3] The district court is the appropriate court to evaluate *Arlington Heights's* fact-intensive standard in the existing equal protection claim and Appellees' new claims in the first instance, and any appeal can be considered after the district court reviews the law and facts together. *See W.M.C.A., Inc. v. Simon*, 370 U.S. 190, 191 (1962) ("the court below should be the first to consider the merits of the federal constitutional claim"). While the government argues that the "strong, race-neutral explanation" recognized in *Mullin* "readily maps onto" Somalia, Mot. at 2, the record is not fully developed and has not been evaluated by the district court. Unlike in *Mullin*, the statements about Somali people are overtly racial. They rely on racial stereotypes disparaging Somalis as criminals, animals and pirates, invoking "powerful racial stereotype[s]" of Black people as crime and "violence prone." *Buck v. Davis*, 580 U.S. 100, 121 (2017). These statements were made in the specific

---

[3] Despite Appellants' wrongful assertion, Mot. at 3, *Noor Doe v. Noem*, Nos. 26-cv-2103, 26-cv-2280, 2026 WL 2085662, at *2 (S.D.N.Y. July 20, 2026) is distinguishable from the racial discrimination claim of Somali TPS holders and is therefore not a dispositive ruling foreclosing Appellees' Equal Protection claim. It is the district court's role to apply *Mullin* and engage in a record-dependent inquiry specific to this case.

context of the Termination decision ruling out the possibility of a "race-neutral" justification considered in *Mullin*.

Appellees' forthcoming Amended Complaint also includes two new claims, including a procedural due process claims that Appellees have constitutionally-protected interests in TPS benefits that has been deprived without adequate process and a claim that that the Secretary acted ultra vires in purporting to terminate Somalia's TPS status because the statute requires the Attorney General to make termination decisions.

Appellants' reliance on two "summary reversal orders" in other TPS cases as authoritatively resolving the legal issues presented here is misplaced. In *Aung Doe*, the court granted summary reversal of a postponement order after both parties agreed that was the correct course. Pls.-Appellee's Position Statement, *Aung Doe v. Mullin*, No. 26-1294 (7th Cir. July 13, 2026), Dkt. 31; *Aung Doe v. Mullin*, No. 26-1294, 2026 WL 2093686 (7th Cir. July 16, 2026). And in *National TPS Alliance*—which involved a vacatur order, not summary reversal, *contra* Mot. at 18—the parties in that case similarly agreed that *Mullin* precluded the underlying reasoning in the lower court's order, such that vacatur and remand to permit consideration upon further briefing was appropriate. Order, *Nat'l TPS All. v. Mullin*, No. 26-199 (9th Cir. July 14, 2026), Dkt. 44.1. Moreover, neither of the postponement orders in those two cases included rulings on an equal protection claim, whereas here, the parties

14

dispute the impact of *Mullin* on their existing and forthcoming claims and the district court has not analyzed Appellees' equal protection claim.

II.     **The District Court Did Not Abuse Its Discretion in Temporarily Maintaining the Administrative Stay to Prevent Irreparable Harms to Appellees While Resolving the Live Issues that Remain After *Mullin*.**

The government portrays the administrative stay as an indefinite substitute for a ruling on Appellees' motion for interim relief. The record shows otherwise. The district court initially preserved the status quo so that Appellants could appear, produce the administrative record, and respond to Appellees' emergency motion. Once that process was complete, both parties agreed that the proceedings could appropriately await the Supreme Court's forthcoming decision in *Mullin v. Doe*. And when *Mullin* issued, the district court promptly lifted the abeyance, obtained the parties' positions concerning the decision's effect, addressed a pending administrative-record dispute, and established an expedited supplemental briefing schedule.

That is active adjudication, not a refusal to rule. The district court has not used the administrative stay to avoid applying *Mullin*. It has temporarily preserved the status quo while determining, after focused adversarial presentation, precisely what *Mullin* requires in this case. Nothing in *Mullin*, *United States v. Texas*, or this Court's precedent makes that process an abuse of discretion.

**A. The Record Reflects the District Court's Diligent and Expeditious Exercise of Its Docket-Management Authority.**

An administrative stay serves a limited but important purpose: it permits a court to "freeze legal proceedings until [it] can rule on a party's request for expedited relief" and thereby "minimize harm while [the] court deliberates." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring). District courts confronting emergency challenges to agency action have used them to preserve the status quo while receiving the submissions necessary to adjudicate a request for preliminary relief. *See, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 13, 16–17 (D.D.C. 2025).

The district court employed the stay for precisely that purpose. When Appellees sought emergency relief, the termination of Somalia's Temporary Protected Status designation was scheduled to take effect eight days later. Appellants had not appeared, produced the certified administrative record, or responded to Appellees' motion. The district court accordingly concluded that a temporary administrative stay was necessary. *See* Dkt. 33 at 3. At the same time, the court required the parties to establish a "prompt briefing schedule" to resolve the motion "as quickly as possible." *Id.* The parties complied, the administrative record was produced, and the court scheduled a hearing on the earliest jointly proposed date. *See* Dkt. 35, 42.

The government's assertion that the stay has remained in effect for "five months" obscures what happened next. The elapsed time comprises three distinct periods, each with a different procedural justification.

First, from March 13 through late April, the parties were producing the administrative record, briefing Appellees' postponement motion, and litigating Appellees' motion to compel. *See* Dkt. 42, 43, 55, 64, 65. The district court did not leave the motion dormant during that period; it was assembling the record and adversarial submissions needed to make a ruling.

Second, from May 1 until *Mullin* was decided on June 25, the litigation was held in abeyance because the district court—without objection from either party—determined that the Supreme Court's decision would likely materially affect the case. See Dkt. 70–73. Appellees agreed to the abeyance provided that the administrative stay remain in place, and the government did not oppose that arrangement. *See* Dkt. 71–72. The government cannot now treat a period during which it accepted the wisdom of awaiting controlling Supreme Court guidance as evidence that the district court refused to adjudicate the dispute.

Third, the district court acted promptly once *Mullin* issued. On July 1, the government moved to lift both the abeyance and the administrative stay. Dkt. 77. The following day, the district court lifted the abeyance, directed the parties to identify remaining viable claims and issues, required Appellants to respond to

Appellees' pending administrative-record motion, and temporarily maintained the administrative stay pending resolution of Appellees' emergency motion. Dkt. 78. The parties filed their joint status report on July 9, agreeing that *Mullin* foreclosed review of non-constitutional challenges to terminations effectuated under the TPS statute but did not decide whether the jurisdictional bar applied to constitutional claims. Dkt. 79 at 2. Four days later, the district court established an expedited schedule under which briefing will conclude no later than August 20. Dkt. 82. The chronology demonstrates the expediency with which the district court has acted.

Nor does Justice Barrett's concurrence in *Texas* compel a different conclusion. The concurrence explains that an administrative stay should last "no longer than necessary to make an intelligent decision" on the underlying request for relief and that a court must apply the governing stay factors once it is "equipped to rule." 144 S. Ct. at 799. It does not establish a fixed temporal limit, much less mandate dissolution of an existing administrative stay the moment intervening Supreme Court precedent issues, before the parties have addressed the impact of that precedent.

Here, *Mullin* fundamentally altered the litigation. It changed the analysis of Appellees' nonconstitutional claims and left unresolved the merits of their constitutional claim. *See Mullin*, 2026 WL 1825840, at *10–13. The parties disagreed about how that analysis applies to the Somalia-specific evidence and about

the appropriate procedural path forward. Dkt. 79 at 2–4. The district court reasonably determined that supplemental briefing was necessary before it could intelligently apply the governing preliminary-relief standard.

The government may ultimately persuade the district court that *Mullin* requires denial of Appellees' motion. But the district court did not abuse its discretion merely by insisting on deciding that question itself. *Texas* cautions against using administrative stays as substitutes for adjudication. It does not prohibit a court from preserving the status quo briefly while undertaking the adjudication the concurrence contemplates.

## B. Maintaining the Status Quo Prevents Irreparable Harm While the District Court Completes Its Expedited Review.

The district court also reasonably preserved the administrative stay because allowing the termination to take effect—even momentarily—would produce immediate irreparable consequences. An administrative stay permits a court to account for "the relative consequences of staying the lower court order versus allowing it to go into effect" while it deliberates. *Texas*, 144 S. Ct. at 798. Here, those relative consequences strongly favor preserving the pre-termination status quo during the short period necessary to complete supplemental briefing.

The district court expressly recognized those consequences when it entered the stay. If Somalia's TPS designation terminates, more than 1,000 TPS beneficiaries will immediately lose the statutory protections associated with that status. 91 Fed.

Reg. 1547. Appellees and other Somali TPS beneficiaries may become subject to detention and removal proceedings and lose employment authorization, state identification and driving privileges dependent on lawful status, as well as the ability to support themselves and their families. *See, e.g.*, Dkt. 2-3 (Decl. of Pl. Mohamed Doe). Many will suffer consequences from a lapse in lawful status that cannot be fully repaired through a later judgment in their favor. *See, e.g.*, 8 U.S.C. § 1255(c)(2).

Those injuries are per se irreparable. The district court was entitled to consider the potential harms of detention, family separation, loss of employment, or removal before it had determined whether Appellees were entitled to interim relief. *See* Dkt. 33 at 2–3. Such harms would be exceptionally difficult—or impossible—to remedy after the fact. *See Doe v. Noem*, 817 F. Supp. 3d 27, 57 (D. Mass. 2026) (concluding that immigration-related harms were "very likely impossible to rectify through final relief that may come at an indeterminate future point").

By contrast, the government's asserted injury consists principally of a brief delay in implementing the termination while the district court completes an expedited adjudicative process. While the government has an important interest in implementing lawful immigration policy, that interest does not establish that every temporary restraint on agency action produces irreparable harm sufficient to override the district court's authority to preserve the status quo pending resolution of a motion. The balance is especially clear here because Somalia's TPS designation has

existed for decades, the government did not oppose maintaining the administrative stay during the parties' agreed abeyance, and the district court has now established an accelerated briefing schedule.

*Mullin* altered the merits issues before the district court; it did not diminish the practical harms that would follow from an immediate termination of TPS. Indeed, there was no dispute in *Mullin* that the affected TPS holders would suffer irreparable harm if the challenged terminations took effect. *See* 2026 WL 1825840, at *17 (Kagan, J., dissenting). Whether Appellees' remaining constitutional claim ultimately warrants preliminary relief is for the district court to determine under the governing standard. In the meantime, preserving the status quo prevents the adjudication from becoming practically meaningless before that determination can occur.

The government's reliance on *Trump v. CASA* does not justify dissolving the stay altogether. 606 U.S. 831 (2025). *CASA* concerned the historical scope of universal injunctions issued in equity and expressly did not resolve whether the Administrative Procedure Act authorizes broader relief against agency action. *See id.* at 847 n.10. The district court has not yet entered a Section 705 postponement order, ruled on class certification, or determined the scope of any preliminary relief. At most, the government identifies a remedial-tailoring issue for the district court to

21

address when it rules. That question provides no basis for eliminating temporary protection even for the named Appellees before their claims are adjudicated.

The administrative stay serves its proper, limited function. It prevents immediate and potentially irreversible disruption while the district court completes the expedited process already underway. Because the court has actively managed the case, promptly responded to *Mullin*, and preserved the status quo only while receiving the submissions necessary to resolve Appellees' motion, its decision was not an abuse of discretion.

### III.    Mandamus Is an Extraordinary Remedy That the Government Entirely Fails to Justify.

Mandamus relief is "an extraordinary remedy, rarely granted, and has stringent requirements. To convince an appellate court to intervene is to employ 'one of the most potent weapons in the judicial arsenal.'" *In re Tsarnaev*, 780 F.3d 14, 16 (1st Cir. 2015) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (citation and internal quotation marks omitted). Mandamus is only appropriate in "those rare cases where the issuance (or non-issuance) of an order (1) raises a question about the limits of judicial power, (2) poses a risk of irreparable harm to the appellant, and (3) is plainly erroneous." *Fortuno*, 582 F.3d at 134. As in *Fortuno*, "[t]he present record does not justify such extraordinary relief," because the district court has not declined to rule.

22

First, there is no question about the limits of judicial power here. Like in *Fortuno*, the district court is not depriving a party of judicial review by declining to rule. *Id.* at 134–35 (finding mandamus inappropriate where the district court was taking appropriate steps to fulfill its obligations). To the contrary, the district court has repeatedly demonstrated expedience, by, for example, scheduling a hearing on Appellees' motion on the first available date the parties jointly proposed. Had the parties disagreed that it was a prudent use of judicial resources to stay proceedings until a decision in *Mullin* the district court would likely have rendered a decision on Appellees' pending motions shortly after the scheduled May 4 hearing. The government's allegation that by administratively staying the case "for months" "in the teeth of binding Supreme Court precedent" the lower court exceeded its boundaries misrepresents the facts. Mot. at 22. It has been less than a month since the ruling in *Mullin*, and not even two weeks since the district court ordered prompt briefing. Dkt. 82. The parties are actively engaged in briefing the issues before the lower court. Like in *Fortuno*, the procedural posture of this case indicates that the district court is prepared to act with expediency. 582 F.3d 131, 135 (1st Cir. 2009) (noting that "in ordering accelerated briefing of the issues that it found salient, the district court has demonstrated its desire to gather expeditiously the necessary information to make a ruling on the preliminary injunction").

Second, the government's allegations of irreparable harm ring hollow as it waited over two weeks after the district court denied its request to lift the administrative stay before filing the instant motion. *Compare* Mot. *with* Dkt. 78. Moreover, Appellants' irreparable harm arguments are unavailing. Appellants allege they face irreparable harm because they cannot immediately implement the Termination, but enacting unlawful agency action does not constitute irreparable harm. *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025). Moreover, Somalia's TPS designation has existed for decades; Appellants will not be irreparably harmed by a brief continuation of the administrative stay pending expedited adjudication of Appellees' postponement motion. And while Appellants face no irreparable harm from the normal course of litigation, should this Court grant mandamus, Appellees would face significant irreparable harm. *See supra* Section II.B. Even if Appellants sufficiently alleged irreparable harm, they fail on the first and third prong of *Fortuno*'s test.

Finally, the district court's administrative stay order is not "clearly erroneous," but rather a standard exercise of the court's inherent authority to manage its own docket. There is no error, much less clear error, represented by the district court's decision to maintain the status quo while it promptly reviews briefing, hears oral arguments, and resolves Appellees' pending motion. *See* supra Section II.

24

Ultimately, the governments' attempt to circumvent regular, proper process by requesting the extraordinary remedy of mandamus before the district court has had the opportunity to review briefing on an expedited schedule, fails on all counts.

## CONCLUSION

The Court should dismiss the appeal for lack of jurisdiction and deny the motion for summary reversal. It should also deny the alternative petition for mandamus. The district court is actively and expeditiously adjudicating Appellees' request for interim relief, and the government has shown neither a clear entitlement to summary disposition nor the clear and indisputable right required for mandamus.

Dated: July 24, 2026                    Respectfully submitted,


/s/ *Nargis Aslami*
Nargis Aslami
Sadaf Hasan
Melissa Keaney
Abbey Rutherford
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Sadaf@muslimadvocates.org
Melissa@muslimadvocates.org
Abbey@muslimadvocates.org

/s/ *Erik Crew*
Erik Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

/s/ *Kacey Mordecai*
Kacey Mordecai
Mide Odunsi

NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W. Suite 600
Washington, D.C. 20005
202.682.1300
kmordecai@naacpldf.org
modunsi@naacpldf.org

Ashley Burrell
Lauren Carbajal (*admission forthcoming*)
 NAACP LEGAL DEFENSE AND

26

EDUCATIONAL FUND, INC.

40 Rector Street #5
New York, NY 10006
202.965.2200
aburrell@naacpldf.org
lcarbajal@naacpldf.org

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

1. This Response complies with the type-volume limitation of Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure because it contains 5,181 words, excluding the parts of the Response exempted by Federal Rule of Appellate Procedure 32(f).

2. This Response complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it was prepared using 14-point Times New Roman font in Microsoft Word for Microsoft 365 Version 16.107.1.

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2026, I caused the foregoing document to be filed with the Clerk of the Court of the United States Court of Appeals for the First Circuit using the Court's CM/ECF system.

*/s/ Nargis Aslami*
Nargis Aslami

*Counsel for Appellees*

# EXHIBIT 1

**Complaint**

**Dkt. 1, *African Communities Together, et al. v. Mullin, et al.*, 1:26-cv-11201 (D. Mass. Mar. 9, 2026)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **COMPLAINT**<br><br>Civil Action No. _____<br><br>Pursuant to L. R. 5.1(c), Plaintiffs note they will be requesting **emergency relief** against agency action taking effect at **11:59 p.m. on March 17, 2026**. |

## INTRODUCTION

1.      On November 21, 2025, President Trump posted on the social media website Truth Social that he was terminating Temporary Protected Status ("TPS") for Somalis in Minnesota, "effective immediately," and announced his intention to "[s]end them back to where they came from."[1] Referencing an ongoing Department of Justice investigation into a Minnesota-based fraud scheme, President Trump claimed that "Somali gangs" were "terrorizing" Minnesotans.[2]

2.      Since then, President Trump has smeared the Somali community publicly, categorically, and repeatedly. He has called Somali people "garbage"[3] and "low IQ people"[4] who "contribute nothing."[5] He has stated that "their country stinks,"[6] is "[f]ilthy, dirty, disgusting, ridden with crime,"[7] "do[es]n't have anything" aside from "murder and robbing ships, bringing in

---

[1] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[2] *Id.*

[3] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call (Dec. 2, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/ (at 02:16:33–02:16:55).

[4] TRANSCRIPT: *President Trump Delivers an Address at the World Economic Forum in Davos, 1.21.26* (Jan. 21, 2026), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-delivers-an-address-at-the-world-economic-forum-in-davos-12126 (at 01:06:23-01:06:50).

[5] Associated Press, *Trump Says He Doesn't Want Somalis in the U.S., Urges Them to Go Back to Their Homeland and Fix It*, NPR (Dec. 2, 2025), https://www.npr.org/2025/12/02/nx-s1-5629305/trump-says-he-doesnt-want-somalis-in-the-u-s-urges-them-to-go-back-to-their-homeland-and-fix-it.

[6] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, *supra* n. 3 (at 02:16:17–02:16:33).

[7] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC News (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166; *see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call (Dec. 9, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/ (at 01:23:25–01:23:51).
(continued…)

ships, pirates,"[8] and is "one of the absolutely worst countries in the World."[9] And he has said point blank: "I don't want [Somali people] in our country."[10]

3.    Defendant Noem's official termination of Somalia's TPS designation, which she issued less than two months after President Trump's November 21, 2025, social media announcement, contravened the clear procedural requirements of the TPS statute by relying on selective and discriminatory facts to justify the termination of Somalia's TPS designation. President Trump's initial post and the Secretary's termination notice in the Federal Register evidence a preordained decision unsupported by required procedures under the TPS statute and the Administrative Procedure Act ("APA"). Moreover, they reflect a desire to target and punish Somali nationals based on their race and national origin in violation of the U.S. Constitution and the APA.

4.    Somalia is currently facing a humanitarian crisis with roots that stretch back decades. In recognition of ongoing armed conflict and other extraordinary conditions threatening the safety of Somali nationals, the United States government designated Somalia for TPS in 1991.

5.    TPS is a Congressionally authorized, humanitarian program that protects eligible individuals from immigration detention and forcible return to countries designated unsafe due to dire conditions such as armed conflict, natural disaster, or other extraordinary circumstances. 8 U.S.C. § 1254a. It provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is not safe for them to return to their countries of origin.

---

[8] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, Roll Call (Jan. 13, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-detroit-economic-club-january-13-2026/#99 (at 00:57:44–00:58:07).
[9] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, at 10:43 PM), https://truthsocial.com/@realDonaldTrump/posts/115919697262007872.
[10] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, *supra* n.3 (at 02:16:17–02:16:55).

6.      The United States government has repeatedly designated and/or extended TPS for Somalia over the past three decades. Since 2002, each extension and redesignation has acknowledged Somalia's ongoing armed conflict, which has led to arbitrary detentions, physical violence, torture, the murder of civilians, and other severe human rights violations. These redesignations have also acknowledged other extraordinary circumstances rendering return to Somalia unsafe for its nationals, such as climate extremes, mass internal displacement, food insecurity, and disease outbreaks.

7.      Currently, approximately 1,082 Somali nationals in the United States are TPS beneficiaries. Additionally, approximately 1,383 Somali nationals have pending TPS applications.[11]

8.      Individual Plaintiffs are four Somali TPS beneficiaries and/or applicants who have established deep ties to the United States and their local communities. Each individual plaintiff is a member either of Plaintiff African Communities Together ("ACT") or of Plaintiff Partnership for the Advancement of New Americans ("PANA"). ACT is a non-profit, membership-based organization that represents and empowers African immigrants, their families, and their communities across the United States—helping them integrate socially, advance economically, and engage civically. PANA is a non-profit, membership-based organization of refugees and displaced peoples, primarily of African, Middle Eastern, Muslim, and South Asian origin, that fights for the full economic, social, and civic inclusion of refugees and displaced populations in the United States. Both ACT and PANA represent the interests of U.S.-based Somali TPS holders and applicants.

---

[11] Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1,547, 1,552 (Jan. 14, 2026).

9.    Plaintiffs bring this action to challenge the unlawful periodic review of Somalia's TPS designation and the resulting termination of it. On January 14, 2026, DHS terminated the designation through a notice in the Federal Register ("Termination").[12] Due to the Termination, over a thousand Somali TPS holders are set to lose their humanitarian protections at 11:59 pm on March 17, 2026.

10.    If TPS for Somalia imminently and unlawfully terminates, Plaintiffs and other Somali TPS beneficiaries will face immediate harms—including loss of immigration status, loss of access to related federal and state benefits (such as work authorization, driver's licenses, and health insurance), and worsened dignitary injuries resulting from allowing a periodic review process and resultant termination tainted by discrimination to take effect. They will further face a myriad of grave risks: remaining in the United States without lawful immigration status puts them at risk of detention and deportation proceedings; departure or forced removal to Somalia puts them at risk of severe physical violence as well as other unsafe country conditions; and forced separation from community and family in the United States will inflict irreparable harm on them and on their community members, relatives, and dependents, including their minor, U.S. citizen children.

11.    Defendants' decision to terminate Somalia's TPS designation violates the TPS statute's procedural requirements and the APA. Specifically, the periodic review process and resulting Termination: reflect Defendants' preordained, pretextual, politically influenced agendas (1) to terminate TPS for Somalia, specifically and (2) to eliminate access to TPS more broadly for non-European countries whose nationals are predominantly non-white; (3) reflect an unexplained and unreasonable change in interpretation of the TPS statute and in related procedures for conducting periodic reviews of TPS designations; (4) violate the TPS statute because of (i) failing

---

[12] 91 Fed. Reg. at 1,54753.

to undertake required consultation with appropriate agencies, such as the U.S. Department of State ("State Department"), (ii) failing to undertake a good faith review of objective evidence of country conditions relevant to the legal grounds for Somalia's TPS designation, and (iii) impermissibly relying on the Administration's determination about the domestic "national interest" as a basis for termination; and (5) departed from the past agency practices of (i) not basing termination decisions on domestic "national interest" and (ii) providing TPS beneficiaries more orderly transition periods ahead of terminations of TPS designations. Furthermore, Defendants' decisions were motivated, at least in part, by racial and national-origin discrimination towards Somali people, in violation of the Fifth Amendment to the U.S. Constitution.

12.    Because the periodic review resulting in the Termination of Somalia's TPS designation violates both the APA and the U.S. Constitution, this Court should expeditiously postpone and ultimately set aside the Termination.

## THE PARTIES

### Plaintiffs

13.    **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. It was founded in 2013.

14.    ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations and their U.S.-based family members. ACT's members have diverse citizenship and immigration statuses and includes TPS holders and/or applicants from Somalia and other African countries, including South Sudan, Ethiopia, and Sudan.

15.     ACT develops and engages in policy and advocacy campaigns calling for the designation, redesignation, and extension of TPS for African countries facing unsafe conditions, in line with the statute's humanitarian principles and intent.

16.     To advance ACT's goals of defending TPS from unlawful terminations and attacks, ACT is part of Communities United for Status and Protection ("CUSP"), which brings together grassroots community groups to advocate for lasting status for TPS-holders from African, Afro-Caribbean, Afro-Latinx, Arab, Middle Eastern, and Asian Pacific Islander communities.

17.     ACT recognizes that, without changes and improvements in U.S. immigration policies, the communities it serves can face many roadblocks and are often threatened unlawfully with being uprooted from their families and communities. That is why ACT supports its members in participating in TPS-related litigation, like this lawsuit.

18.     ACT's members who are Somali TPS recipients and/or applicants live around the United States.

19.     ACT brings this action on behalf of itself and its members.

20.     **Plaintiff Partnership for the Advancement of New Americans ("PANA")** is a non-profit, membership-based organization of refugees and displaced people with a focus on African, Middle Eastern, Muslim, and South Asian communities.

21.     Founded in 2014, PANA's mission is to advocate for the full economic, social, and civic inclusion of its membership. It serves as a research, public policy, and community organizing hub that centers the leadership and voices of refugees and immigrant communities to address systemic barriers such as racial and ethnic profiling, religious discrimination, and limited access to housing, jobs, and education. PANA works to build power, increase civic participation, and promote equitable treatment and meaningful inclusion for its membership.

7

22. PANA provides support to communities directly affected by unjust immigration policies. In addition to its public policy advocacy, PANA engages more than 40,000 former refugee, African immigrant, Muslim, and Southeast Asian voters to ensure the fair representation of these historically underrepresented communities. And it provides direct legal services and community support services, with a human rights focus.

23. PANA is involved in efforts to preserve, defend, and expand TPS designations and related benefits, due to the substantial role TPS plays in protecting PANA's members and their families. PANA signs on to advocacy letters supporting redesignations and extensions of TPS for its member populations; it hosts Know Your Rights sessions on TPS and immigrants' rights, including online so that community members across regions can access the content; and it provides immigration legal services.

24. PANA has more than four hundred members, who shape the organization's priorities and work, and it brings this action on behalf of itself and its members.

25. **Plaintiff Alexander Doe** is a Black man and Somali national who lives in the U.S. and applied for TPS over a year ago. He is in his twenties and is a member of PANA.

26. Alexander has lived in the U.S. for years and is currently pursuing two associate's degrees, while also working full-time as an educational aide in a computer program at an elementary and middle school.

27. He came to this country fleeing violence and unsafe conditions in Somalia, which directly affected him and his family. Once he arrived in the U.S., Alexander decided to focus on obtaining education. Because his own access to education was disrupted and denied due to the armed conflict and other conditions in Somalia, he places immense value on education, both as a student and as an educator.

28.    As a student, Alexander has enrolled in two- to three-times the minimum course load each semester, in order to obtain his degrees as quickly as possible. He is scheduled to graduate in a few months' time with two associate's degrees, hoping to pursue teaching credentials, subsequently. He would like to enroll in a four-year degree program this summer and eventually earn his master's degree in counseling.

29.    In addition to being a busy student, Alexander helps to educate almost six hundred children each week at the school where he is an instructional aide, since the curricula for virtually every child there involves an element of computer-based learning. Many of these students depend on Alexander emotionally, and he places special value on his ability to support these students.

30.    Alexander has also developed a strong sense of community by volunteering at and attending mosque. He attends mosque almost daily and participates in community and educational programming, hoping to volunteer for some of the youth programming when he has more time.

31.    **Plaintiff Mohamed Doe** is a Black man who is a Somali national and TPS holder. Mohamed is in his thirties and has lived in the U.S. for years. TPS is his sole form of immigration status, and he relies on it for his employment authorization and his driver's license. He is a member of ACT and lives in the U.S.

32.    Mohamed is married and lives with his wife, who is currently pregnant with their first child. His wife is lawfully present in the United States under a non-TPS program and relies on him for financial and other forms of support. Mohamed goes with her to many doctors' appointments and has provided essential care and support during her pregnancy. They live in a place without public transportation, so having a driver's license is necessary for managing the day-to-day needs of his and his family's life.

33.     Mohamed has family members who are United States citizens and with whom he is close. At the same time, he supports his parents and multiple siblings, who live abroad and rely on him for financial support: his parents have medical issues, and his younger siblings need Mohamed's support to afford their education.

34.     Mohamed is an educator and a coach of two different scholastic sports teams. He is a source of emotional and mental support for his students and is the official mentor for a small group of seven students who rely on him for career advice, educational guidance, and counseling. Mohamed's students rely on him for many other things, too, including help with getting to class, accessing school-provided meals, and navigating the emotional challenges of growing up. Mohamed was responsible for introducing a halal meal program at his school, from which many Muslim students there now benefit.

35.     Mohamed also volunteers at his mosque and has led prayers and taught lessons on the Quran. He is an integral part of his mosque and is very attached to the community he has built through it.

36.     **Plaintiff Tyson Doe** is a Black man in his twenties who is a Somali national, a TPS holder, and a member of ACT. TPS is his sole source of immigration status; and he relies on it as the basis for his employment authorization and his driver's license.

37.     Tyson is a teacher in an elementary school and has taught there for many years. His young students are very attached to him emotionally. Recently, Tyson took a day off teaching for the first time this school year, and when he came back, his students kept asking where he had been and why had he left them. Tyson's students have many important standardized tests coming up soon, and Tyson worries that their performance and ability to focus and prepare will be impacted if he is unable to stay in the U.S. as their teacher and continue to support their education and their

lives. Tyson teaches in an area with a shortage of teachers, and if he were unable to continue teaching, he fears that his young students would be left without an adequate substitute.

38.     Tyson has a United States citizen brother, with whom he previously lived for years. Tyson still visits his brother frequently and talks to him often. Tyson also has many close friends in the U.S. whom he considers to be like family. Additionally, Tyson is very involved in his local mosque community and volunteers at the mosque regularly. He also continues to support family abroad, who rely on him.

39.     Tyson, in turn, relies on TPS for his work authorization—so he can continue teaching elementary school—as well as for his driver's license, which is essential for driving to and from his work and for purchasing groceries and running other errands, since his town does not have public transportation.

40.     Tyson's hope is to eventually pursue a master's degree in education, so that he can have an even bigger impact on the lives of his students.

41.     **Plaintiff Nina Doe** is a Black woman who is a Somali national, a TPS holder, and a member of ACT. Nina is in her twenties and has lived in the U.S. for years. TPS is currently her sole form of immigration status.

42.     Nina first came to this country as a high school exchange student through a philanthropic program. During that time, she lived with a host family of U.S. citizens who did not have children of their own and considered her to be like a daughter. Nina continues to stay in touch with her host family and considers them to be like family, too.

43.     After returning to Somalia briefly following her exchange program, Nina returned to the U.S. to pursue higher education through a competitive scholarship.

11

44.     Nina earned her bachelor's degree in the U.S. and began teaching at an elementary school, working with a mix of immigrant and U.S.-born students. She loves teaching young children because of the way that educational opportunities changed her own life for the better, and she wants to have a similar impact on this younger generation.

45.     Nina has a cousin who is a United States citizen, and the two support each other in many ways. She also lives with two of her siblings: one is pursuing a graduate degree and works in the public interest sector, and one is working in finance. All three siblings live together and support each other.

46.     Nina relies on her TPS for her ability to continue teaching and pursuing her passion for childhood education, and she hopes to continue teaching through her TPS-based employment authorization.

47.     As TPS holders and/or applicants, Nina, Tyson, Mohamed, Alexander, and other members of ACT and PANA have access to immigration status and to related federal benefits (like work authorization) and state benefits (like driver's licenses and health insurance); have protection against deportation proceedings and related confinement within the U.S.; avoid forced removal to Somalia—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there; avoid forced removal to unsafe third countries; and avoid forced separation from loved ones and communities in the United States.

**Defendants**

48.     **Defendant Kristi Noem** is the Secretary of DHS. As an appointee of President Trump and member of his Cabinet, she is subject to his authority. As the highest-ranking officer

12

for DHS, Secretary Noem has statutory authority over all TPS designation, extension, and termination decisions. She is sued in her official capacity.[13]

49.    **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program. Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

50.    **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

51.    **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

<u>**JURISDICTION AND VENUE**</u>

52.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

53.    The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

---

[13] On information and belief, Defendant Noem is still DHS Secretary at this time, but President Trump will soon replace her. Plaintiffs will update the case-caption accordingly, once the role transitions to a new person.

54.    The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages." 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[14]

55.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

## THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES

56.    Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific . . . criteria."[15]

57.    Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics."[16] Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and to provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay."[17]

---

[14] *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *see also Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[15] *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith (July 19, 1983)).

[16] 101 Cong. Rec. 25811, 25838 (Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute), https://www.congress.gov/101/crecb/1989/10/25/GPO-CRECB-1989-pt18-7-1.pdf.

[17] *Id.* at 25837 (statement of Rep. Bill Richardson).

58.    Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the U.S., subject to procedural requirements and safeguards. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) there is a natural disaster or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the [DHS Secretary] finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C). Neither the armed conflict nor environmental disaster grounds for TPS designation include contemplation of domestic "national interest." *Id.* § 1254a(b)(1)(A)–(B). Like those grounds, the "other extraordinary conditions" ground for TPS designation turns on conditions in the foreign country that prevent its nationals from returning safely; this ground does refer to domestic "national interest" but only as an exception to designation: not a condition for it. *Id.* § 1254a(b)(1)(C).

59.    The TPS statute first requires the Secretary to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* § 1254a(b)(2). As long as the Secretary consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

60.    By contrast, Congress limited the Secretary's discretion to periodically review TPS designations.[18]

61.    The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

62.    Congress textually limited periodic reviews to consideration of the "*conditions in the foreign state*" for which "a designation is in effect," in order to determine "whether the conditions for such designation . . . continue to be met." *See id.* § 1254a(b)(3)(A) (emphases added). Because Congress chose not to refer to domestic "national interest" within the armed conflict and environmental disaster grounds for TPS designation, and domestic "national interest" is only an exception and not a condition for the "extraordinary or temporary circumstances" designation—Congress omitted any reference to domestic "national interest" in the provisions of the TPS statute governing periodic reviews of designations, 8 U.S.C. § 1254a(b)(3)(A), and terminations of designations, 8 U.S.C. § 1254a(b)(3)(B). Both periodic reviews and terminations of designations turn on the relevant conditions *in the designated country*.

63.    The periodic review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. Once DHS begins it, it coordinates with USCIS (one of its sub-

---

[18] *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* 15–18, 27 (2020) ("GAO Report") (differentiating between the discretion afforded before and after an initial designation), https://www.gao.gov/assets/gao-20-134.pdf.
(continued…)

16

components) and with the U.S. Department of State ("State Department"), which each prepare country conditions memoranda and recommendations for the Secretary.[19]

64.    Customarily, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[20] After considering the materials provided, USCIS typically prepares a detailed recommendation, called a "Director Memo" for the DHS Secretary, which it bases on current and objective country conditions.[21]

65.    After this periodic review of the TPS designation, once the Secretary makes her decision, the statute requires that she "provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

66.    Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." *Id.* § 1254a(b)(3)(C).

---

[19] *See id.* at 15–16; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 299–300, 352 (E.D.N.Y. 2019) (describing standard USCIS and Department of State processes for TPS periodic reviews).
[20] *See* GAO Report, *supra* note 18 at 15-21; *see also, e.g.*, *Saget*, 375 F. Supp. 3d at 299-300.
[21] *See, e.g.*, GAO Report, *supra* note 18 at 18; *Saget*, 375 F. Supp. 3d at 299–300, 333 ("Plaintiffs seek neither a substantive declaration nor individualized relief. Rather, they seek to prevent the Secretary and DHS from making TPS determinations based on a subjective goal engineered toward termination rather than on the *objective assessment required by law*.") (emphases added).

67.    In contrast, if the Secretary timely determines that "*a foreign state . . .* no longer continues to meet the conditions for designation," she "shall terminate the designation by publishing notice in the Federal Register.*" Id.* § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.*

68.    The text of the statute provides no grounds for the termination of a TPS designation other than a determination that the foreign state no longer meets the conditions for designation. The statute does not provide for terminations of TPS designations based on domestic "national interest."  On information and belief, until 2025, DHS had this understanding of the statute. Indeed, from 1992 to 2025, no termination of a TPS designation based on "other extraordinary conditions" had rested on domestic "national interest."[22]

69.    The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period, time that greatly aided TPS beneficiaries who had to navigate fundamental transitions and changes to their and their families' lives.[23] The practice of furnishing orderly transitions of at least six months has been ongoing for over thirty years, and the Trump

---

[22] *See* Decl. of Golnaz Fakhimi ("Fakhimi Decl."), *Afr. Cmmtys. Together v. Noem*, 1:25-cv-13939-PBS (D. Mass. Dec. 23, 2025) ("*ACT I*"), Dkt. 8-7 at 19-29 (Ex. 15, Decl. of Aaron Reichlin-Melnick) (explaining that, in the 35-year history of TPS and before 2025, the sole rationale cited to justify termination of TPS had been an end to the temporary country conditions which authorized the designation).

[23] *See id*., Dkt. 8-6 at 66–69 (Ex. 7, chart documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months) ("Transition Periods Chart").
(continued…)

Administration applied it during its first term in office. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago.[24]

70.    Congress specified strict and ongoing eligibility criteria for individuals to get and maintain TPS status, including: (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees. *See id.* § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Additionally, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

71.    After USCIS receives an application, it screens the applicant for potential grounds of ineligibility (including criminal and national security grounds) and does so, in part, by using biometric data (including the applicant's photo, signature, and fingerprints) to vet the applicant through background and security checks (if the applicant is at least 14 years-old).[25] Application processing, inclusive of background and security checks, typically takes many months. USCIS estimates current processing times for initial TPS applications under surviving TPS designations

---

[24] *Id.*

[25] *See* USCIS, *Temporary Protected Status*, https://www.uscis.gov/humanitarian/temporary-protected-status (last visited Mar. 8, 2026).
(continued…)

range from 9 to 18.5 months, with the processing time for initial applications from Somalis estimated to be 14.5 months.[26]

72.     Notably, Congress did *not* condition an individual's eligibility for TPS on having entered the country lawfully or on having any lawful immigration status within the United States. Additionally, Congress ensured that DHS could withdraw an individual's TPS status on the basis of ineligibility, failure to maintain continuous physical presence in the U.S. subsequent to the grant, and/or failure to register annually subsequent to the grant. *See* 8 U.S.C. § 1254a(c)(3); 8 C.F.R. § 244.14.

73.     Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation and related immigration confinement. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the U.S.; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the stringent requirements for asylum or other immigration relief. *See id.* § 1254a(b)(1).

74.     TPS applicants with *prima facie* eligibility for TPS may receive work authorization and protection from deportation and related immigration confinement while their application is pending. *See id.* §§ 1254a(a)(4)(B), (d)(4); 8 C.F.R. §§ 244.5, 244.10(e).

---

[26] *See* USCIS, *Case Processing Times*, https://egov.uscis.gov/processing-times/ (last visited Mar. 8, 2026) (specifying estimated processing time of 14.5 months for initial applications for TPS (Form I-821) for applicants from Somalia).

75.     As TPS beneficiaries, TPS holders and applicants can also access related federal benefits (like work authorization) and state benefits (like identification, driver's licenses, and health insurance, depending on the state).

## SOMALIA'S INITIAL TPS DESIGNATION, EXTENSIONS, REDESIGNATIONS, AND TERMINATION (1991–2026)

76.     Somalia first received designation for TPS in September 1991, based on extraordinary and temporary conditions that prevented Somalis from returning in safety.[27] *See* 8 U.S.C. § 1254a(b)(1)(C). Since then, its TPS designation on this basis has been consistently extended, *see id*. § 1254a(b)(3)(C), or redesignated, *see id*. § 1254a(b)(3)(A). Since, 2002, Somalia has been designated for TPS based both on the extraordinary and temporary conditions ground for designation, *id.* § 1254a(b)(1)(C), and on the ongoing armed conflict ground for designation, *id.* § 1254a(b)(1)(A).[28]

---

[27] *Designation of Nationals of Somalia for Temporary Protected Status*, 56 Fed. Reg. 46,804 (Sep. 16, 1991).

[28] Extension of Designation of Somalia Under Temporary Protected Status Program, 57 Fed. Reg. 32,232 (July 21, 1992); Extension of Designation of Somalia Under Temporary Protected Status Program, 58 Fed. Reg. 48,898 (Sep. 20, 1993); Extension of Designation of Somalia Under Temporary Protected Status Program, 59 Fed. Reg. 43,359 (Aug. 23, 1994); Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 Fed. Reg. 39,005 (July 31, 1995); Extension of Designation of Somalia Under Temporary Protected Status Program, 61 Fed. Reg. 39,472 (July 29, 1996); Extension of Designation of Somalia Under Temporary Protected Status Program, 62 Fed. Reg. 41,421 (Aug. 1, 1997); Extension of Designation of Somalia Under Temporary Protected Status Program, 63 Fed. Reg. 51,602 (Sep. 28, 1998); Extension of Designation of Somalia Under Temporary Protected Status Program, 64 Fed. Reg. 49,511 (Sep. 13, 1999); Extension of Designation of Somalia Under Temporary Protected Status Program, 65 Fed. Reg. 69,789 (Nov. 20, 2000); Extension and Redesignation of Somalia under Temporary Protected Status Program, 66 Fed. Reg. 46,288 (Sep. 4, 2001); Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 Fed. Reg. 48,950 (July 26, 2002); Extension of the Designation of Somalia Under Temporary Protected Status Program, 68 Fed. Reg. 43,147 (July 21, 2003); Extension of the Designation of Temporary Protected Status for Somalia, 69 Fed. Reg. 47,937 (Aug. 6, 2004); Extension of the Designation of Somalia for Temporary Protected Status, 70 Fed. Reg. 43,895 (July 29, 2005); Extension of the Designation of Temporary Protected Status for Somalia; Automatic Extension of (continued…)

77.     Since 1991, civil war has embroiled Somalia, after opposition groups led an uprising to overthrow Mohamed Siad Barre's authoritarian regime, which had come into power through a military coup.[29] No central government reemerged to take Barre's place and a civil war broke out as rival clan factions and militia groups competed to fill the power vacuum, control the capital, and gain territory.[30]

78.     Attempts at peacekeeping and instituting transitional governments were unsuccessful from the 1990's throughout the 2000's, as clan-based violence continued and armed militia groups continued to engage in violent fighting, particularly in Somalia's capital,

---

Employment Authorization Documentation for Somalia TPS Beneficiaries, 71 Fed. Reg. 42,653 (July 27, 2006); Extension of the Designation of Temporary Protected Status for Somalia; Automatic Extension of Employment Authorization Documentation for Somalia Temporary Protected Status Beneficiaries, 73 Fed. Reg. 13,245 (Mar. 12, 2008); Extension of the Designation of Somalia for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Somalian TPS Beneficiaries, 74 Fed. Reg. 37,043 (July 27, 2009); Extension of the Designation of Somalia for Temporary Protected Status, 75 Fed. Reg. 67,383 (Nov. 2, 2010); Extension and Redesignation of Somalia for Temporary Protected Status, 77 Fed. Reg. 25,723 (May 1, 2012); Extension of the Designation of Somalia for Temporary Protected Status, 78 Fed. Reg. 65,690 (Nov. 1, 2013); Extension of the Designation of Somalia for Temporary Protected Status, 80 Fed. Reg. 31,056 (June 1, 2015); Extension of the Designation of Somalia for Temporary Protected Status, 82 Fed. Reg. 4,905 (Jan. 17, 2017); Extension of the Designation of Somalia for Temporary Protected Status, 83 Fed. Reg. 43,695 (Aug. 27, 2018); Extension of the Designation of Somalia for Temporary Protected Status, 85 Fed. Reg. 14,229 (Mar. 11, 2020); Extension and Redesignation of Somalia for Temporary Protected Status, 86 Fed. Reg. 38,744 (July 22, 2021); Extension and Redesignation of Somalia for Temporary Protected Status, 88 Fed. Reg. 15,434 (Mar. 13, 2023); Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59,135 (July 22, 2024).

[29] Ioan M. Lewis, *History of Somalia*, Encyclopedia Britannica (Dec. 4, 2025), https://www.britannica.com/topic/history-of-Somalia; Lauren Ploch Blanchard, Cong. Rsch. Serv., IF10155, *Somalia* at 1 (June 30, 2025), https://www.congress.gov/crs_external_products/IF/PDF/IF10155/IF10155.16.pdf; Off. of the Historian, State Department, *Somalia, 1992-1993*, https://history.state.gov/milestones/1993-2000/somalia (last visited Mar. 8, 2026).

[30] Off. of the Historian, *Somalia, 1992-1993*, *supra* note 29; Lewis, *History of Somalia*, *supra* note 29; U.S. Comm. for Refugees and Immigrants, *The Crisis in Somalia* at 3 (2021), https://refugees.org/wp-content/uploads/2021/04/Somalia-Backgrounder.pdf. (continued…)

Mogadishu.[31] In 2006, the Islamic Courts Union ("ICU") took control of the capital and southern regions of the country, leading to another installment of civil war as Ethiopian and Somali troops worked to defend the Transitional Federal Government ("TFG"), formed in 2004.[32] The ICU splintered as it lost power, but al-Shabaab, a militant faction with ties to al-Qaeda, survived. Al-Shabaab, armed militia groups, and clan militia continued their insurgency against the TFG and sought control over the capital.[33] The international community, including the United States, established the counterinsurgency force, African Union Mission in Somalia ("AMISOM"), which has been working to assist the Somali government in its fight against al-Shabaab and other armed militia groups since 2007.[34] Although a formal federal government and constitution were established in 2012,[35] al-Shabaab's armed insurgency and clan-based fighting have persisted.[36] The Somali government and al-Shabaab, along with other armed non-state actors, continue to engage in armed conflict, as al-Shabaab has gained increasing control over territory in southern Somalia, encroaching on the capital, while conducting violent attacks throughout the country.[37]

79.      Hundreds of thousands of deaths have been documented since the start of the civil war in 1991,[38] along with human rights abuses, including child recruitment, extrajudicial killings,

---

[31] Lewis, *History of Somalia*, *supra* note 29.

[32] *Id.*; U.S. Comm. for Refugees and Immigrants, *The Crisis in Somalia*, *supra* note 30, at 3.

[33] Lewis, *History of Somalia*, *supra* note 29; U.S. Comm. For Refugees and Immigrants, *The Crisis in Somalia*, *supra* note 30, at 3.

[34] Blanchard, *supra* note 29, at 2; Matt Bryden, *Somalia at Risk of Becoming a Jihadist State*, African Center for Strategic Studies, (Nov. 17, 2025), https://africacenter.org/publication/asb45en-somalia-risk-jihadist-state/.

[35] Blanchard, *supra* note 29, at 1; Lewis, *History of Somalia*, *supra* note 29.

[36] *See generally* 78 Fed. Reg. 65,690; 89 Fed. Reg. 59,135.

[37] *See* Blanchard, *supra* note 29, at 1; Bryden, *Somalia at Risk of Becoming a Jihadist State*, *supra* note 34; 88. Fed. Reg. 15,434; 89 Fed. Reg. 59,135.

[38] *See* John Norris & Bronwyn Bruton, Ctr. for Am. Progress, *Twenty Years of Collapse and Counting: The Cost of Failure in Somalia* at 10–11 (2011), https://cdn.americanprogress.org/wp-content/uploads/issues/2011/09/pdf/somalia.pdf.

(continued…)

sexual and gender-based violence, human trafficking, torture, and arbitrary arrest and detention.[39] The deadly consequences of the war have been exacerbated by climate events, severe malnutrition and food insecurity, a crumbling healthcare system, and widespread outbreaks of disease.[40]

80.     DHS's 2023 and 2024 redesignations of TPS for Somalia on both the "armed conflict" and "extraordinary and temporary conditions" grounds noted ongoing attacks leading to civilian deaths, targeted assaults against government officials, al-Shabaab's violent opposition to the Federal Government of Somalia, climatic shocks, lack of healthcare infrastructure, cholera outbreaks, food insecurity and malnutrition, gender-based violence, humanitarian needs, and human rights violations.[41]

81.     With respect to the ongoing armed conflict, the 2024 redesignation noted that "Somalia continues to experience widespread insecurity due to armed conflict involving state and non-state actors," with al-Shabaab and clan-related violence "continu[ing] to pose a significant threat to Somalia's security," by carrying out deadly attacks with improvised explosive devices and subjecting civilians to human rights abuses including summary executions, indiscriminate and targeted killings, gender-based violence, child recruitment, disappearances, and physical abuse.[42] DHS reported an estimate of 1,300 civilian casualties between January and September 2023.[43]

---

[39] *See* 88. Fed. Reg. 15,434; 86 Fed. Reg. 38,744; UN OHCHR & UN Assistance Mission in Somalia, *Protection of Civilians: Building the Foundation for Peace, Security and Human Rights in Somalia* at 1 (2017), https://www.ohchr.org/sites/default/files/Documents/Countries/SO/ReportProtectionofCivilians.pdf.

[40] *See* Norris & Bruton, *Twenty Years of Collapse and Counting*, *supra* note 38 at 10–11; UNHCR, *Somalia Refugee Crisis Explained* (July 17, 2023), https://www.unrefugees.org/news/somalia-refugee-crisis-explained/; 86 Fed. Reg. at 38,747–49; 88. Fed. Reg. at 15,436–39; 89 Fed. Reg. at 59,138–39.

[41] 88. Fed. Reg. at 15,436–39; 89 Fed. Reg. at 59,137–39.

[42] 89 Fed. Reg. at 59,137–38.

[43] *Id.* at 59,137–38.

(continued…)

82.    The extraordinary and temporary conditions DHS reported in the 2024 redesignation include environmental impacts, healthcare-related needs, food insecurity, and the need for humanitarian assistance. Approximately 6.9 million people, around half of Somalia's population, were estimated to require humanitarian assistance.[44] Severe droughts and floods affected more than 2.5 million people, damaged agriculture and livestock, caused an increase in waterborne diseases, and exacerbated food insecurity.[45] The floods made access to healthcare even more difficult, all while Somalia was facing a continuous cholera outbreak since 2022, with 46 deaths and 18,300 suspected cases reported in 2023.[46] In all, an estimated 4.3 million people in the country experienced acute food insecurity, 1.5 million children under the age of five suffered from acute malnutrition, and 3.8 million people were displaced due to conflict, natural disasters, and other factors.[47]

83.    On January 14, 2026, Defendant Noem formally announced the Termination of Somalia's TPS designation in the Federal Register, terminating both grounds for it (armed conflict and extraordinary and temporary conditions), and announcing a 60-day wind-down period ahead of the March 17, 2026, effective date of the Termination.[48]

## DEFENDANTS' DISCRIMINATORY TARGETING OF THE SOMALI COMMUNITY

***Discriminatory Targeting of the Somali Community Coinciding with the Periodic Review of Somalia's TPS Designation***

84.    During the pendency of the periodic review of Somalia's TPS designation, President Trump, Defendants, and other senior officials in his Administration singled out the

---

[44] *Id.* at 59,138.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] 91 Fed. Reg. at 1,552.

Somali community in the U.S. through a series of disparaging and outrageous remarks that made it clear that the Trump Administration and Defendants intended to terminate TPS for Somali people without following procedural requirements.

85.     Since November 2025, President Trump has repeatedly expressed his desire to expel Somali people from the U.S. based on their race and national origin and his disdain for them, including TPS beneficiaries. As described above, he purported to terminate TPS for Somali people in Minnesota via a Truth Social post on November 21, 2025: "I am, as President of the United States, hereby terminating, effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER!"[49] Upon information and belief, the President directed Defendants to terminate Somalia's TPS designation.

86.     The Trump Administration's and Defendants' targeting of Somali people with the racially coded reference to "gangs" reflects their discriminatory views of Somali people based on their race and national origin.

87.     This rhetoric escalated during a November 27, 2025, press conference, in which President Trump said:

> Somalians have caused a lot of trouble. They're ripping us off for a lot of money. . . . [Somalia is] practically no country. It's devastated, it's crime-ridden, it's a mess, it's a disgrace, and we took their people at tremendous—we're not taking their people anymore. We're not taking their people. And we're getting a lot of their people out because they're nothing but trouble.[50]

---

[49] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, at 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[50] *Remarks: Donald Trump Speaks with Servicemembers Via Video on Thanksgiving - November 27, 2025*, Roll Call (Nov. 27, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-thanksgiving-videoconference-servicemembers-november-27-2025/#284 (at 00:49:08–00:49:56). On the same day, USCIS issued a policy announcing that pending and prospective immigration benefits applications would give negative weight to "country-specific factors," (continued…)

88.     The same day, President Trump posted on Truth Social, stating that "hundreds of thousands of refugees from Somalia are completely taking over the once great State of Minnesota. Somalian gangs are roving the streets looking for 'prey.'"[51] He described Somalia as "a decadent, backward, and crime ridden nation, which is essentially not even a country for lack of Government, Military, Police, schools, etc…," and he referred to Somali-American Congresswoman Ilhan Omar as "always [being] wrapped in her swaddling hijab."[52] Instead of construing conditions like "crime" and lack of governance in Somalia through the lens that Congress specified in the TPS statute—the lens of whether conditions in Somalia render return there unsafe for its nationals—President Trump has weaponized his recognition of such conditions for discriminatory aims: twisting references to them within hateful, racist, xenophobic rhetoric that impugns the belonging of Somalis in this country and their very humanity.

89.     Just a few days later, the President continued this pattern of weaponizing the ongoing conditions in Somalia to malign Somalis and to state he considers them unwelcome and unwanted in the U.S., remarking during a December 2, 2025, Cabinet meeting:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country. . . . We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country. Ilhan Omar is garbage, she's garbage. Her friends are garbage. These aren't people that work. These aren't people that say let's go, come on, let's make this place great. These are people that do nothing but complain. They complain, and from where they came from, they've

---

flagging the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025. The nationals of these countries are majority non-white, including those of 8 countries who are majority Black, including Somalis. *See infra* ¶ 135.

[51] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[52] *Id.*

(continued…)

got nothing. You know, if they came from Paradise and they said this isn't Paradise. But when they come from hell and they complain and do nothing but bitch we don't want them in our country. Let them go back to where they came from and fix it.[53]

90.    The next day, on December 3, 2025, President Trump expressed more vitriol against Somali-American Congresswoman Ilhan Omar, whose district covers the areas where the bulk of the Somali community in the United States lives:

> [Somalis] have a Representative, Ilhan Omar, who they say married her brother. It's a fraud. She tries to deny it now, but you can't really deny it because, you know, just happened. She shouldn't be allowed to be a Congresswoman. And I'm sure people are looking at that and she should be thrown the hell out of our country. . . . She's always talking about the Constitution provides me with – uh, go back to your own country and figure out your constitution. All she does is complain about this country, and without this country she would not be in very good shape. She probably wouldn't be alive right now. . . . And she's a disaster. She should not be – and her friend shouldn't be allowed – frankly, they shouldn't even be allowed to be Congress people, OK? They shouldn't even be allowed to be Congress people because they don't represent the interests of our country.[54]

91.    On that day, President Trump expressed further race and national-origin based animus against Somalis, in response to comments from Minneapolis Mayor James Frey, who had claimed pride in his city's having the largest Somali population in the country. Again, President Trump weaponized his awareness of unsafe conditions in Somalia to express xenophobia and hate for Somalis, saying:

---

[53] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call, *supra* note 3 (at 02:16:17–02:17:45). On the same day as this Cabinet meeting, USCIS instituted a spate of new policies involving a blanket pause on asylum adjudications; a blanket pause on the adjudication of other benefits applications, including applications for TPS, if the applicant comes from a country whose nationals are subject to entry bans, which includes Somalis; and the revetting of approved beneficiaries of immigration benefits, including TPS, if the applicant comes from a country whose nationals are subject to entry bans, which includes Somalis. *See infra* ¶ 136.

[54] *Remarks: Donald Trump Announces a Reduction in Automobile Mileage Standards - December 3, 2025*, Roll Call (Dec. 3, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-fuel-standards-environment-december-3-2025/ (at 00:52:58–00:55:21).

(continued…)

I wouldn't be proud to have the largest Somalian – look at their nation. Look how bad their nation is. It's not even a nation, it's just a people walking around killing each other. . . . . And the Somalians should be out of here. They've destroyed our country. And all they do is complain, complain, complain. . . . So Somalia is considered by many to be the worst country on earth. I don't know. I haven't been there. I won't be there any time soon, I hope. But what Somalia and what the Somalian people have done to Minnesota is not even believable. . . . And you have to have people come in that are going to love our country, cherish our country. They want to kiss our country good night. They talk about our country. We want them to pray for our country. This is not the people living in Minnesota.[55]

92.     Nearly a week later, on December 10, 2025, President Trump "boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[56] He also juxtaposed Somali immigrants with immigrants from Scandinavia, conveying the Administration's preference for immigrants from white, European countries:

> "[W]hy is it we only take people from shithole countries, right? Why can't we have some people from Norway, Sweden – just a few – let us have a few from Denmark. Do you mind sending us a few people? Send us some nice people, do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime – the only thing they're good at is going after ships."[57]

93.     On December 19, 2025, Stephen Miller, the U.S. Homeland Security Advisor, smeared Somalis in Minnesota, calling Somalis "pirates": "We should not be shocked when you import a population whose primary occupation is pirate, that they are going to come here and steal everything we have. . . . So, yes, the pirates have stolen all of our money and they have to go home."[58]

---

[55] *Id.* (at 00:52:49–00:55:21).

[56] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, *supra* note 7.

[57] *Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, *supra* note 7 (at 01:22:49–01:23:51).

[58] Jesse Waters Primetime, *'GO HOME': Stephen Miller decries 'pirate' Somalis amid alleged fraud scandal*, Fox News (Dec. 20, 2025), https://www.youtube.com/watch?v=Eqs42DviZ3Q. (continued…)

94.    On December 31, 2025, the President posted:

Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!!"[59]

***Discriminatory Targeting of Somalis in Minnesota, Coinciding with the Termination of Somalia's TPS Designation***

95.    President Trump's blatant disdain for Somali people, including TPS beneficiaries, rendered the Somali community the lightning rod for his Administration's brutal immigration crackdown in Minnesota, which is where much of the Somali community in the U.S. lives. Defendant DHS launched the "largest immigration enforcement operation ever carried out by the agency,"[60] in the weeks following December 26, 2025, after unsubstantiated claims surfaced about Somali "fraud" in Minnesota, through a video posted online that went viral and that Vice President Vance reposted.[61]

96.    Defendants'    Termination    notice    and    associated    public messaging also evidence their disdain for Somali people.[62] On January 13, 2026—the day that

---

[59] Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 31, 2025, at 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464.

[60] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* Associated Press (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[61] *See* PBS News Hour, *Federal Agents Probe Fraud Allegations Targeting Somali Child Care Providers in Minnesota*, PBS. (Dec. 30, 2025), https://www.pbs.org/newshour/show/federal-agents-probe-fraud-allegations-targeting-somali-child-care-providers-in-minnesota; JD Vance (@JDVance), X (Dec. 27, 2025, at 6:55 PM), https://x.com/JDVance/status/2005064947437650251.

[62] *See* 91 Fed. Reg. at 1,551–52.
(continued…)

USCIS announced the Termination decision—Defendants and other government officials issued a flurry of negative messages about Somalis, Somalia, and Minnesota.

97.     DHS reposted USCIS's announcement, adding a picture of President Trump and a line from a Somali pirate in the movie "Captain Phillips": "I am the captain now."[63]

98.     The White House posted a screenshot of a Fox News headline about the announcement, with the caption: "BREAKING: President Trump ENDS TPS for thousands of Somalis amid massive fraud scandals in Minnesota. 'We are putting Americans first.' - @Sec_Noem."[64]

99.     DHS also posted online a screenshot of the same Fox News headline, noting: "DHS is ENDING Temporary Protected Status for Somalians in the United States. Our message is clear. Go back to your own country, or we'll send you back ourselves."[65]

100.     President Trump wrote an online post about "convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, dangerous people from foreign mental institutions and insane asylums, and other deadly criminals," whom "ICE want[s] to . . . remove" from Minnesota—where the largest Somali community in the United States lives—declaring ominously: "FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!"[66]

---

[63] Homeland Security (@DHSgov), X (Jan. 13, 2026, at 10:49 AM), https://x.com/DHSgov/status/2011103313299980307.
[64] The White House (@WhiteHouse), X (Jan. 13, 2026, at 9:57 AM), https://x.com/WhiteHouse/status/2011090186629750919.
[65] Homeland Security (@DHSgov), X (Jan. 13, 2026, at 9:40 AM), https://x.com/dhsgov/status/2011085958381256830.
[66] Donald J. Trump (@realDonaldTrump), X (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023 . (continued…)

101. Later that day, during an event at the Detroit Economic Club, President Trump went on a lengthy rant about Somali people in Minnesota, and alleged fraud based on misleading[67] evidence:

> In Minnesota we're cracking down on the Somali scams . . . They're scammers, they're scammers. They always will be. And we're getting them out and we're not going to pay them. . . . They have nothing, they get welfare payments and they have Mercedes Benzes. It angers me so much, but we're going to straighten out our country. This was done under Biden and Obama, very much under Obama. It all started under Obama. And we just can't – we've got a great country; we're not going to screw it up. But this is one of the great scams ever. . . . We're getting them out. We got a lot of them out already, but we're getting them out. We're also going to revoke the citizenship of any naturalized immigrant from Somalia or anywhere else who is convicted of defrauding our citizens. . . . And they know it too. . . . But in conclusion, as we liberate our country from this cultural scourge and the plague of corruption and fraud, we'll rediscover the natural energy and native spirit that truly makes America great again."[68]

102. The following day, when Defendant Noem published the Termination notice in the Federal Register, President Trump reposted an article entitled "Somali Suitcase Stash: Feds say $130 million moved from Ohio airport to Minnesota on way overseas," and wrote: "They should be thrown out of the USA. Get it done, NOW! That includes their loser Rep. Omar, who married her brother (gross!). President DJT."[69]

103. Defendants' resultant immigration enforcement operations in Minnesota have been an extreme manifestation of their discriminatory intent toward the Somali community: wide-

---

[67] Chabeli Carrazana, *Here's what's really happening with child care fraud in Minnesota*, MinnPost (Jan. 12, 2026), https://www.minnpost.com/other-nonprofit-media/2026/01/heres-whats-really-happening-with-child-care-fraud-in-minnesota-explained/.

[68] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, *supra* note 8 (at 00:50:48–01:00:48).

[69] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 14, 2026, at 8:13 AM), https://truthsocial.com/@realDonaldTrump/posts/115893625622462941. (continued…)

ranging and devastating in its consequences for a broad array of noncitizens and citizens alike.[70]

Stark examples of the violent consequences for U.S. citizens include: ChongLy "Scott" Thao, a 56-year-old man whose front door immigration agents broke down without a judicial warrant and whom the agents dragged out of his home, in his underwear, at gunpoint, in front of his 4-year-old grandson;[71] Renee Good, a 37-year-old poet, writer, and mother of three, whom immigration

---

[70] The harms of the Administration's dragnet immigration enforcement campaign in Minnesota have extended to a wide array of Black and Brown noncitizens of various nationalities, including over 1,000 people challenging unlawful confinement through immigration habeas petitions in the past two months alone, some of whom are children as young as 2 years old and 5 years old. Max Nesterak, *Lawyers filed over 1000 lawsuits challenging immigration detentions during Operation Metro Surge*, Minnesota Reformer (Feb. 19, 2026), https://minnesotareformer.com/2026/02/19/lawyers-filed-over-1000-lawsuits-challenging-immigrant-detentions-during-operation-metro-surge/; Emma Tucker, *Minnesota toddler taken into ICE custody with father and flown to Texas is returned to mother next day, lawyer says*, CNN (Jan. 24, 2026), https://www.cnn.com/2026/01/24/us/elvis-tipan-echeverria-toddler-ice-arrest-minnesota; Camilo Montoya-Galvez, *ICE releases 5-year-old Liam Conejo Ramos and his father from custody*, CBS News (Feb. 2, 2026), https://www.cbsnews.com/news/liam-conejo-ramos-released-ice-custody/. The Administration has failed to comply with nearly 100 court orders in those cases so far, some of which have involved the immigration confinement of children as young as 2 years old and 5 years old. *See Juan T.R. v. Noem*, No. 0:26-cv-00107, 2026 WL 555601 (D. Minn. Feb. 26, 2026). When a federal judge confronted a government attorney about these pervasive violations of court orders, the attorney stated in open court that "the system sucks" and expressed fearfully that "I am not white, as you can see. And my family's at risk as any other people that might get picked up too." Kyle Cheney & Josh Gerstein, *'This job sucks': Government lawyers, drowning in immigration cases, have had it*, Politico (Feb. 4, 2026), https://www.politico.com/news/2026/02/04/trump-ice-minnesota-prosecutors-immigration-00765031?utm_content=politico/magazine/Politics&utm_source=flipboard.
[71] *See* Jack Brook, *A U.S. citizen says ICE forced open the door to his Minnesota home and removed him in his underwear after a warrantless search*, PBS News (Jan. 20, 2026), https://www.pbs.org/newshour/nation/a-u-s-citizen-says-ice-forced-open-the-door-to-his-minnesota-home-and-removed-him-in-his-underwear-after-a-warrantless-search. (continued…)

agents shot and killed in her car;[72] and Alex Pretti, a 37-year-old intensive-care nurse, whom immigration agents shot and killed on the street.[73]

***Ongoing Discriminatory Targeting of Somalis Since the Termination Announcement for Somalia's TPS Designation***

104.    Since Defendants issued the Termination, the Administration has persisted in its discriminatory targeting of Somali people.

105.    Just four days after the publication of the Termination, the President posted on January 18, 2026: "There is 19 Billion Dollars in Minnesota Somalia Fraud. Fake 'Congresswoman' Illhan [sic] Omar, a constant complainer who hates the USA, knows everything there is to know. She should be in jail, or even a worse punishment, sent back to Somalia, considered one of the absolutely worst countries in the World."[74]

106.    On January 21, 2026, during his speech at the World Economic Forum in Davos, Switzerland, President Trump again weaponized Somalia's dire and unsafe conditions for xenophobic aims, by imputing them to the Somali people and then insisting they should not be allowed to remain in Minnesota or the U.S. He asserted that "[t]he situation in Minnesota reminds us that the West cannot mass import foreign cultures which have failed to ever build a successful society of their own. I mean, we're taking people from Somalia, and Somalia is a failed – it's not a nation. Got no government, got no police, got no nothing."[75] He described it as "a country that's

---

[72] *See* Michael Biesecker, et al., *Family and neighbors mourn woman who was shot by ICE agent and made Minneapolis home*, Associated Press (Jan. 8, 2026), https://apnews.com/article/ice-shooting-minneapolis-minnesota-9aa822670b705c89906f2c699f1d16c5.

[73] *See* Jacob Phillips, *Who was Alex Pretti, the intensive care nurse shot dead in Minneapolis?*, BBC (Jan. 28, 2026), https://www.bbc.com/news/articles/c62r4g590wqo.

[74] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, at 10:43 PM), https://truthsocial.com/@realDonaldTrump/posts/115919697262007872.

[75] TRANSCRIPT: *President Trump Delivers an Address at the World Economic Forum in Davos, 1.21.26, supra* note 4 (at 01:08:00–01:08:54).

(continued…)

34

not a country"[76] and a country that "do[es]n't have anything" beyond "murder and robbing ships, bringing in ships, pirates."[77] He further stated: "Can you believe that, Somalia? They turned out to be higher IQ than we thought. I always say, these are low IQ people, how do they go into Minnesota and steal all that money? And we have – you know they're pirates, they're good pirates."[78]

107.    And on February 24, 2026, during his State of the Union address, President Trump said, "[t]he Somali pirates who ransacked Minnesota, remind us that there are large parts of the world where bribery, corruption and lawlessness are the norm, not the exception. Importing these cultures through unrestricted immigration and open borders brings those problems right here to the USA," and concluded "[w]e' re going to take care of this problem."[79] Upon information and belief, the "we" President Trump refers to are Defendants and others in his Administration who are to address the "problem" of Somali people in Minnesota by limiting immigration pathways, including TPS, for Somali people.

**DEFENDANTS' TARGETING OF OTHER NON-WHITE, NON-EUROPEAN TPS BENEFICIARIES**

108.    The Trump administration has long embraced an anti-immigration agenda, which includes an objective of eliminating or severely restricting access to TPS for non-white, non-European immigrants, targeting them with racist rhetoric and attempting to use any mechanism possible to remove them from the country.

---

[76] *Id.* (at 01:08:27–01:08:54).

[77] *Speech: Donald Trump Addresses the Detroit Economic Club - January 13, 2026*, *supra* note 8 (at 00:57:44–00:58:07).

[78] TRANSCRIPT: *President Trump Delivers an Address at the World Economic Forum in Davos, 1.21.26*, *supra* note 4 (at 01:06:23–01:06:50).

[79] *Speech: Donald Trump Delivers the State of the Union Address - February 24, 2026*, Roll Call (Feb. 24, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-state-of-the-union-february-24-2026/ (at 00:46:18–00:47:30).

(continued…)

109.    In his first term, President Trump denigrated non-European countries designated for TPS and with majority non-white populations. Most notably, he referred to such countries as "shithole" countries, in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "[t]ake them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway,"[80] which is majority white and European.

110.    Between 2017 and 2018, the first Trump Administration announced terminations of TPS designations for Haiti, Sudan, Nicaragua, El Salvador, Honduras, and Nepal—all non-European countries whose nationals are predominantly non-white. Several courts and Congressional investigations subsequently found that the 2017 and 2018 periodic reviews conducted for TPS designations of these countries were not based on an objective review of country conditions as required by the TPS statute and were part of a predetermined goal of ending access to TPS.[81] These cases were dismissed after the Biden Administration extended the TPS designations.

---

[80] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

[81] *See, e.g.*, Ex. 1 of Jt. Letter Br., *Ramos v. Nielsen*, Case No. 3:18-cv-01554-EMC (N.D. Cal., July 17, 2018), Dkt. 43-1 at 2, https://cdn.cnn.com/cnn/2018/images/07/18/tps-case-duke-email.pdf (email from then DHS Secretary to then White House Chief of Staff, stating that decisions concerning TPS designations of Nicaragua and Honduras "along with the public statements will send a clear signal that TPS in general is coming to a close" and that she understood the decisions to be "consistent with the President's position on immigration" and a means to "to get to the President's objectives"); Minority Staff of S. Comm. on Foreign Rels., 116th Cong*., Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* at 41–42 (Comm. Print 2019), https://www.congress.gov/116/cprt/SPRT38237/CPRT-116SPRT38237.pdf (finding terminations of TPS designations to be influenced by political considerations related to upcoming elections and disregarded returning nationals' safety); *Saget*, 375 F. Supp. 3d at 359–62 (postponing (continued…)

111.    Courts played a crucial role in safeguarding access to TPS against unlawful periodic reviews and resultant terminations of TPS designations. They assumed jurisdiction over related legal challenges and, on the basis of the APA and/or the Equal Protection guarantees of the Constitution, they granted interim relief, denied dismissals of claims, and/or granted final relief.[82]

112.    President Trump and key officials in his current Administration have made clear their commitment to end TPS for non-white non-European immigrants. Referring to entry bans that included Somali refugees, Trump noted that "in [his] second term, we're going to expand each

termination of TPS for Haiti based on a likelihood of success on APA claims that periodic review process infected by undue political influence and pretext informed by President Trump's "America First" initiative); *id*. at 369–71 (elaborating myriad of evidence supporting conclusion that "the White House (and the President's agenda more broadly) influenced" periodic reviews of TPS designations and resulting termination decisions, including for Haiti).

[82] *Saget*, 375 F. Supp. 3d at 340–53, 359–60, 365–74 (holding that TPS statute did not bar judicial review and postponing Haiti's TPS termination because of likelihood of success on claims that the periodic review of its designation was contrary to law as preordained and pretextual; arbitrary and capricious because of a *sub silentio* departure in agency's practice of reviewing country conditions and because of improper political influence; and was unconstitutional due to discriminatory animus and disparate impact); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 328 (D. Md. 2018) (denying government's motion to dismiss challenge to El Salvador's TPS termination because court had jurisdiction over APA and constitutional claims under the TPS statute and finding that plaintiffs plausibly alleged violations of the Equal Protection and Due Process Clauses and that the termination was arbitrary and capricious due to a change in agency practice regarding review of country conditions); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 404–09 (D. Mass. 2018) (denying government's motion to dismiss challenge to terminations of TPS for Haiti, El Salvador, and Honduras because TPS statute did not bar review of APA and constitutional claims and plaintiffs plausibly alleged that an unexplained change in agency policy governing review of country conditions was motivated by unlawful animus and was arbitrary and capricious); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) (granting preliminary injunction in challenge to TPS terminations for Haiti, Sudan, El Salvador, and Nicaragua because of a likelihood of success on claims that DHS changed its policy governing country conditions review without explanation, the Secretary was politically influenced in her decision-making, and President Trump expressed animus against non-white, non-European immigrants), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *NAACP v. DHS*, 364 F. Supp. 3d 568 (D. Md. 2019) (finding jurisdiction to review constitutional claim and denying government's motion to dismiss because plaintiffs plausibly alleged that the termination of Haiti's TPS was motivated by racial or national origin discrimination). (continued…)

and every one of those bans because we have no choice."[83] In November 2023, Stephen Miller, who is now President Trump's Deputy Chief of Staff and the chief architect of his immigration policy platform, flagged the revocation of TPS designations as a priority for the incoming administration, without consideration of country conditions or the merit of any individual designation. As described below, Defendants operationalized this priority.[84]

113.    While campaigning, Vice President Vance repeatedly characterized TPS as "a magic amnesty wand" through which other administrations have been "taking people and giving them legal status," the legality of which he flatly denied: "[t]hat is not to say that they're here legally."[85] And President Trump said that he would "[a]bsolutely . . . revoke" TPS for Haitians, saying, "[y]ou have to remove the people; you cannot – we cannot destroy our country . . . In my

---

[83] O. Kay Henderson, *Trump Tells Iowa Crowd He'll Reinstate, Expand Travel Ban*, Radio Iowa (Oct. 17, 2023), https://www.radioiowa.com/2023/10/17/trump-tells-iowa-crowd-hell-reinstate-expand-travel-ban/.

[84] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. Times (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

[85] CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sep. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (starting at approximately 5:10); *see also Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sep. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jdvance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").
(continued…)

opinion, it's not legal."[86] He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town" of Springfield, Ohio.[87]

114.    At her January 17, 2025, confirmation hearing to become Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to relevant country conditions and untethered from the bounds of the TPS statute. She claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "the program was intended to be temporary."[88]

115.    On the first day of President Trump's second term in office, he issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14,159 § 16(b), 90 Fed. Reg. 8,446 (Jan. 20, 2025) ("'Invasion' EO"). The supposed "invasion" involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The Executive Order describes immigrants, including lawfully present TPS holders, as "invaders" committing "vile and heinous acts against innocent Americans." *Id.*

116.    The Executive Order directs Secretary Noem to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." "Invasion" EO § 16(b). Although

---

[86] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They have to be removed'*, NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[87] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concerned'*, Rolling Stone (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621.

[88] *ACT I*, Case No. 1:25-cv-13939-PBS (D. Mass.), Dkt. 8-6 at 101 (Ex. 9 of Fakhimi Decl.) (Certified Transcript of Confirmation Hearing of Kristi Noem at 104:05–104:22).

Congress did not condition TPS eligibility on having any valid immigration status, *see* 8 U.S.C. § 1254a(c), and although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States." "Invasion" EO § 16(b).

117.    Soon after the EO was issued, in early February 2025, Defendant Noem said that the TPS program "has been abused, and it doesn't have integrity right now. . . . So we are ending that extension of that program [for Venezuela], adding some integrity back into it, and that the Administration is "evaluating all of our [TPS] programs to make sure they truly are something that's to the benefit of the United States, so that they're not to the benefit of criminals."[89]

118.    Also in February 2025, Vice President Vance said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[90] Congress, however, had enacted TPS to enable the creation of country-conditions-based humanitarian protections for nationals of designated countries—all of whose applications *are* evaluated on a case-by-case basis, subject to stringent and ongoing eligibility criteria. *See* 8 U.S.C. § 1254a(c); *supra* ¶¶ 70–72.

119.    In her time as DHS Secretary, Defendant Noem has repeatedly asserted that TPS is a program to benefit people who have entered the country "illegally" or who supposedly commit crimes in the United States. In announcing her decision to end TPS for Venezuela, for instance,

---

[89] *See* Tr., *Meet the Press – Feb. 2, 2025*, NBC News (Feb. 2, 2025), https://www.nbcnews.com/meet-the-press/meet-press-february-2-2025-n1311457.
[90] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, Washington Examiner (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/.
(continued…)

40

she said on January 29, 2025, that she would not allow Venezuelan TPS holders to "stay here and violate our laws."[91] In her February 20, 2025, press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens,[92] *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[93]

120. DHS, under Secretary Noem's leadership, has claimed that TPS has allowed "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers"—despite TPS's being limited to individuals already in the country and excluding those with more than a single misdemeanor.[94]

121. On February 3, 2026, Tricia McLaughlin, DHS Assistant Secretary for Public Affairs, described TPS as being used by prior administrations as "a de facto amnesty program,"

---

[91] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860 (at approximately 0:58).

[92] The term "alien" is used throughout the Immigration and Nationality Act to describe non-citizens, but it and the related term "illegal alien" are considered by some to be a derogatory term used particularly to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93. Notably the current Trump Administration concertedly specified that it would use these terms, as a matter of policy, departing from the contrary policy of the Biden Administration. *See, e.g.*, Todd Lyons, Acting Director, U.S. Immigr. & Customs Enforcement, *Updated Terminology for Communications Materials and Internal and External Communications* (Mar. 31, 2025), https://www.ice.gov/doclib/foia/policy/memo_CommsTerminology_03.31.2025.pdf.

[93] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphases in original).

[94] Homeland Security (@DHSgov), X (May 19, 2025, at 5:18 PM), https://x.com/DHSgov/status/1924575437344186612. (continued…)

allowing "[g]ang members, known and suspected terrorists, people with rap sheets from their own country including murder and other heinous crimes" to "com[e] into our country, creating a national security crisis."[95]

122.    And as recently as February 9, 2026, Defendant Noem claimed that TPS "was abused" and repeated the claim that "previous administrations have used it as a de facto amnesty program for decades."[96]

123.    However, Defendants have left undisturbed the TPS designation of Ukraine, the sole majority-white nation among the fifteen with active TPS designations at the time the Administration took office in January 2025. Ukraine, like Haiti and Venezuela, received an extension of it TPS designation until 2026 from the previous administration.[97] And like Venezuela and Haiti, thousands of recent immigrants from Ukraine received status through the previous administration's TPS designations. However, in January and February of 2025, Defendants Noem and DHS targeted only the TPS designations of Haiti and Venezuela—both non-European countries whose nationals are majority non-white—for unprecedented "vacatur" attempts of the previous administration's extensions of TPS. *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 751, 752–53 (9th Cir. 2026). After the announcement of the administrative vacaturs of the TPS designations for Venezuela and Haiti, and when asked if he planned to revoke TPS for Ukrainians, President

---

[95] Homeland Security (@DHSgov), X (Feb. 3, 2026, at 11:15 AM), https://x.com/DHSgov/status/2018720131140985176 (statement appears starting at approximately 1:01 in posted video clip from Fox News interview).
[96] Secretary Kristi Noem (@Sec_Noem), X (Feb. 9, 2026, at 5:08 PM), https://x.com/Sec_Noem/status/2020983211673952504.
[97] Extension of the Designation of Ukraine for Temporary Protected Status, 90 Fed. Reg. 90,5938 (Jan. 17, 2025); Extension of the 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 5,961 (Jan. 17, 2025); Extension and Redesignation of Haiti for Temporary Protected Status 89 Fed. Reg. 54,484 (July 7, 2024).
(continued…)

Trump responded, "[w]e're not looking to hurt them. Especially Ukrainians, they've gone through a lot."[98] The distinction the President has offered to predominantly white Ukrainian immigrants, also appears in his campaign to cancel humanitarian parole statuses for non-white, non-European immigrants, while leaving those protections in place for Ukrainians. In March 2025 DHS revoked the parolee status of all beneficiaries under the Cuban, Haitian, Nicaraguan and Venezuela parole program, while leaving the "United 4 Ukraine" parole program in place for the majority white nationals of Ukraine. *See Doe v. Noem*, 784 F. Supp. 3d 437, 451 (D. Mass. 2025).

124.    To date, Defendant Noem has terminated the TPS designation for every country for which she conducted a periodic review: thirteen in all, so far. The impacted countries are Somalia, Ethiopia, South Sudan, Cameroon, Haiti, Burma, Nepal, Afghanistan, Syria, Yemen, Nicaragua, Honduras, and Venezuela. All of them are non-European countries whose nationals are majority non-white.

## THE ADMINISTRATION'S DISCRIMINATION AGAINST NON-WHITE, NON-EUROPEAN IMMIGRANTS

125.    Stephen Miller, a member of the President's current and prior cabinets, has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[99] review of 900 emails sent by Miller to media outlets going back to 2015 revealed repeated themes

---

[98] Sergio Martinez-Beltran & Joel Rose, *As protections expire, Ukrainians who escaped war face an uncertain future*, NPR (Mar. 28, 2025), https://www.npr.org/2025/03/28/nx-s1-5318049/as-protections-expire-ukrainians-war-uncertain-future-uniting-for-ukraine.

[99] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, S. Poverty L. Ctr. (Nov. 12, 2019), https://www.splcenter.org/resources/hatewatch/stephen-millers-affinity-white-nationalism-revealed-leaked-emails/.
(continued…)

of white genocide and a focus on interracial crime.[100] A 2019 article noted that Miller has lauded historical immigration laws that imposed quotas based on racist assumptions.[101]

126.     During his first Administration, President Trump referred to non-white, non-European immigrants as "animals,"[102] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[103] These and other remarks have the hallmarks of rhetoric used by avowed white nationalists, who shroud their racial animus in the so-called "Replacement Theory," which posits that non-white immigrants will "replace" the white race, and in doing so, undermine their perception of the United States' white foundation, history, and culture.[104]

127.     President Trump also adopted the rhetoric of eugenicists, by embracing the so-called "racehorse theory." "Initially used for horses, the theory was ultimately used to justify selective breeding of people, including forced sterilization laws that were on the books in 32 states

---

[100] *Id.*

[101] Adam Serwer, *Trump's White-Nationalist Vanguard*, The Atlantic (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . . show Miller praising racist immigration restrictions from a century ago, while bitterly lamenting the law that repealed them.").

[102] Miriam Valverde*, In Context: Donald Trump's comments about immigrants, 'animals,'* PolitiFact (May 17, 2018), https://www.politifact.com/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[103] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC*, Vox (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John T. Bennett, *"Dumping ground": Trump echoes conservative "Project 2025" at first rally as a felon*, Roll Call  (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . . And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[104] *See* Nat'l Immigr. F., *The 'Great Replacement' Theory, Explained*, (2021), https://forumtogether.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf. (continued…)

and used in some of them up through the 1970s."[105] He referred to the theory in remarks to a predominantly white crowd in Minnesota during his first term: "You have good genes, you know that, right? . . . You have good genes. A lot of it is about the genes, isn't it? Don't you believe? The racehorse theory. You think we're so different? You have good genes in Minnesota."[106]

128.    In the campaign leading to his second presidential term, President Trump said that "we got a lot of bad genes in our country right now."[107] He said that non-white, non-European immigrants from Africa, the Middle East, Asia, and South America are "poisoning the blood of our country," repeating this trope over a two-year span.[108] He repeatedly impugned the nationals of

---

[105] Seema Mehta, *Blowing the 'racehorse theory' whistle*, L.A. Times (Oct. 5, 2020), https://enewspaper.latimes.com/infinity/article_share.aspx?guid=f7927a63-d5b7-4097-a9cb-0c2d910def46 (offering related commentary from Paul Lombardo, a Georgia State University law professor who specializes in bioethics and has written multiple books on the history of eugenics in the U.S.: "'When Trump says at a rally in Minnesota, "You have good genes, I believe in the racehorse theory of heredity," he has all of the earmarks of a classic eugenicist,' Lombardo said. 'It has been astounding to me as somebody who has studied this stuff for 40 years that any public figure would be willing to use that kind of language that so clearly echoes the kinds of things we heard from the people who were running the eugenics movement back in the '20s and '30s.'").

[106] *Id.*

[107] Jake Traylor et al., *Trump suggests immigrants have 'bad genes' in latest disparagement of migrants*, NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[108] *See, e.g.*, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam, *Raheem Kassam interviews Donald Trump*, YouTube (Oct. 1, 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45); *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call (June 15, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108 ("So they come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country. They're destroying our country, and we're not going to let it happen.") (at 00:46:02–00:47:05). (continued…)

countries from these regions, calling their presence in the country an "invasion,"[109] as did

Defendant Noem.[110] He said that people from these regions have "wrecked our country," and that

the United States was receiving "prisoners, murderers, drug dealers, mental patients, and terrorists

. . . . from the Congo, from Yemen, from Somalia, from Syria."[111] And he boasted of his successes

in excluding Black immigrants, including Somalis, despite the dangerous and threatening

conditions for nationals in the country stating, for example: "I banned refugees from Somalia, very

dangerous places, and from all of the most dangerous places all over the world . . . [s]ome very

rough people, some very, very rough people come out of these areas."[112]

---

[109] *See, e.g.*, *Speech: Donald Trump Accepts the 2024 GOP Nomination for President in Milwaukee - July 18, 2024*, Roll Call (July 18, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-convention-acceptance-milwaukee-july-18-2024/ ("The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, the Middle East. . . . They're coming at levels that we've never seen before. It is an invasion indeed.") (at 01:02:15–01:02:33).

[110] *See South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS News (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (describing irregular immigration across the southern border as an "invasion happening on purpose. . . . to remake the foundation of this country.") (starting at approximately 4:57).

[111] *See Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, Roll Call (Apr. 2, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/ (at 00:03:15–00:04:18); *see also* Team Trump (@TeamTrump), Truth Soc. (Aug. 20, 2024, at 3:46 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335 (caption quoting President Trump, stating "We have criminals from all over the world pouring into our country right now."); *Speech: Donald Trump Holds a Political Event on Crime in Howell, Michigan - August 20, 2024*, Roll Call (Aug. 20, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-howell-michigan-august-20-2024/ (at 00:33:51–00:35:34); *Speech: Donald Trump Holds a Campaign Rally in Uniondale, New York – September 18, 2024*, Roll Call (Sep. 18, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-uniondale-new-york-september-18-2024/ (at 00:51:55–00:53:03).

[112] *See Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, Roll Call (Oct. 16, 2023), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#11 (at 00:36:59–00:37:40).

(continued…)

129.    In contrast, Trump welcomed immigrants from "[n]ice countries, you know like Denmark, Switzerland . . . . [and] Norway"—all of which are countries whose nationals are majority white—and non-European countries, which he described as "unbelievable places and countries."[113]

130.    Since resuming office, President Trump and his Administration have repeatedly used the term "remigration."[114] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[115]

131.    In June 2025, President Trump "directed" the "entire Administration to put every resource possible" into the "single largest Mass Deportation Program in History."[116] He said he would not "let America become a Third World Country filled with Crime, failing Schools, collapsing Hospitals, and total Social Dysfunction. It's called 'REMIGRATION' and, it will, MAKE AMERICA GREAT AGAIN!"[117]

---

[113] *See* Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

[114] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Truth Soc. (July 5, 2025, at 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[115] Connor Greene, *Trump's Department of Homeland Security Embraces a Word With Ties to White Nationalism*, Time (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS issued a call to 'remigrate.' Here's the history of the term often associated with far-right groups*, CNN (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[116] Donald J. Trump (@realDonaldTrump), Truth Soc. (June 15, 2025, at 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[117] Donald J. Trump (@realDonaldTrump), Truth Soc. (July 5, 2025, at 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102. (continued…)

47

132.    DHS has echoed these sentiments, including by posting a one-word tweet in October 2025 that simply stated "Remigrate."[118] And on December 15, 2025, DHS claimed over social media that "[a]ll America wants for Christmas is remigration."[119]

133.    On November 27, 2025, President Trump declared his intent to "permanently pause migration from all Third World Countries,"[120] and claimed that "most" of the 53 million "foreign" people in the United States "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels."[121] President Trump went as far to say that he intends to deport any foreign national deemed "non-compatible with *Western civilization*,"[122] again referencing white, European values as a guide to his Administration's enforcement actions.

***Policies Reflecting Discrimination Against Somalis and Other Non-European, Non-White Immigrants***

134.    The Administration has undertaken a number of immigration policy changes to effectuate its goal of severely reducing if not eliminating Somali people and members of other non-European, non-white immigrant communities throughout the United States.

135.    On November 27, 2025, USCIS announced policy changes under which its adjudication of pending and prospective immigration benefits applications, including applications for TPS, accord negative weight to "country-specific factors,"—flagging illustratively each

---

[118] Homeland Security (@DHSgov), X (Oct. 14, 2025, at 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.
[119] Homeland Security (@DHSgov), X (Dec. 15, 2025, at 2:59 PM), https://x.com/DHSgov/status/2000656958748328114.
[120] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, at 11:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.
[121] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, at 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.
[122] Shivani Tanna & Rishabh Jaiswal, *Trump vows to freeze migration from 'Third World Countries' after D.C. attack*, Reuters (Nov. 28, 2025), https://www.reuters.com/world/trump-says-us-will-permanently-pause-migration-third-world-countries-2025-11-28/ (emphases added). (continued…)

country's screening and vetting capabilities, information sharing policies, whether countries have significant "terrorist presence" within their territory, visa overstay rates, and cooperation with accepting back their deported nationals from the U.S.—the sorts of factors at issue in entry bans that the President instituted effective June 9, 2025, against the nationals of 19 countries who are majority non-white. Of them, eight are majority Black, including Somalia.[123]

136.    On December 2, 2025, USCIS instituted a new policy (1) pausing all asylum processing in the U.S., (2) pausing the processing of immigration benefits applications, including applications for TPS, from people in the U.S. who come from any of the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025, including Somalia; and (3) announcing the revetting of approved beneficiaries of immigration benefits, including beneficiaries of TPS, who come from any of the 19 countries whose nationals are subject to entry bans under the terms of the President's June 9, 2025, proclamation.  The nationals of these countries are majority non-white, including those of 8 countries who are majority Black, including Somalis.[124]

---

[123] *See* Policy Alert, U.S. Citizenship & Immigr. Serv., *Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits* (Nov. 27, 2025), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251127-Discretion.pdf (citing Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, Fed. Reg. 22,491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf).

[124] *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf (citing Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Fed. Reg. 22,491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf). (continued…)

137.    On December 16, 2025, President Trump announced an expansion of the entry bans, to take effect January 1, 2026.  The newest entry bans extend to an additional 22 countries, the nationals of which are majority non-white. The nationals of 20 of those countries are majority Black.  Of those 20 countries, 18 are African.[125]

138.    On December 18, 2025, the Director of USCIS announced on social media that the processing pause on immigration applications would extend to applicants who are nationals of countries that President Trump had newly designated for entry bans only two days prior.[126]  USCIS formalized that expansion within a written policy issued January 1, 2026.[127]

139.    On January 21, 2026, the U.S. Department of State instituted a policy indefinitely pausing the issuance of immigrant visas (entry permits) to the nationals of over 75 countries, including Somalia and 34 other countries that are African or whose nationals are majority Black and descended from Africans.[128]

140.    Due to these policies, President Trump was able to announce in January 2026 at the World Economic Forum that "[i]n 2025, for the first time in fifty years, the United States had

---

[125] Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, (Dec. 16, 2025),  https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.

[126] *See* Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS News (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another-20-countries/.

[127] *See* Policy Mem. U.S. Citizenship & Immigr. Serv., Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries (Jan. 1, 2026), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf.

[128] *See* U.S. Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance* (last updated Feb. 2, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.
(continued…)

reverse migration," stating "[b]oy, that was nice."[129] He went on to say that "[t]he explosion of prosperity . . . and progress that built the West" came from the "very special culture" "share[d]" by "America and Europe," which "we have to keep [] strong" and "defend" in order to "rediscover the spirit that lifted the West from the depths of the dark ages to the pinnacle of human achievement."[130]

141.    Since the President's January 2026 appearance at the World Economic Forum in Davos, his Administration has apparently singled out Somalis for fast-tracked defensive asylum proceedings in immigration court, in order to precipitate and hasten their deportation.[131]

***Preferential Treatment of Immigrants Who are White and European***

142.    Defendants have shown a strong bias in favor of immigrant populations they perceive to be European and white.

143.    Defendants have spared white, European-descended immigrants from policies that it has otherwise directed against non-European, non-white immigrants. For example, the Administration has relied on visa-overstay rates to justify immigration policy decisions adverse to non-European, non-white immigrants, such as terminating TPS for Somalia.[132] However, objective data about visa-overstay rates reveals that nationals of majority-white countries with high numbers of overstays—such as the United Kingdom or Canada—have not been targeted by the

---

[129] TRANSCRIPT: *President Trump Delivers an Address at the World Economic Forum in Davos, 1.21.26*, *supra* note 4 (at 01:02:47–01:03:09).

[130] *Id.* (at 01:08:54-01:09:39); *see also* David Smith, *Trump paints himself as great white hope in racism-drenched Davos speech*, The Guardian (Jan. 21, 2026), https://www.theguardian.com/business/2026/jan/21/trumps-davos-speech-stephen-miller-white-identity-politics.

[131] *See* Ximena Bustillo, *Immigration courts fast-track hearings for Somali asylum claims*, NPR (Feb. 9, 2026), https://www.npr.org/2026/02/09/nx-s1-5707217/somali-asylum-cases-rescheduled.

[132] *See* 91 Fed. Reg. at 1,551.

(continued…)

Administration's immigration-related policy changes, whereas nationals of countries with very low numbers of overstays—mostly Muslim countries whose nationals are not descended from Europeans and African countries whose nationals are majority Black—are.[133]

144.    Beyond not prioritizing white and European immigrants for adverse immigration consequences, the Administration has otherwise instituted immigration policies that favor these populations.

145.    On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Defendant Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[134] Afrikaners are a white minority ethnic group in South Africa who are "aligned with an extremist ideology that has historically resisted integration and democratic reform."[135] The Trump Administration has called them "victims of unjust racial discrimination."[136]

146.    On March 7, 2025, President Trump posted on Truth Social about the new policy favoring refugee admission and settlement for Afrikaners, stating: "any Farmer (with family!) from

---

[133] Margy O'Herron & Doug Rand, *New Entry Bans, Same Faulty Reasoning*, The Brennan Ctr. for Justice (Dec. 19, 2025), https://www.brennancenter.org/our-work/research-reports/new-entry-bans-same-faulty-reasoning.

[134] Exec. Order No. 14204, 90 Fed. Reg. 9,497 (Feb. 12, 2025).

[135] Kimahli Powell & Jean Freedberg, Harvard Carr-Ryan Ctr. for Hum. Rts, *The Afrikaner Exception: Race and Strategic Dismantling of U.S. Refugee Protection under the Trump Administration* (May 19, 2025), https://www.hks.harvard.edu/centers/carr-ryan/our-work/carr-ryan-commentary/afrikaner-exception-race-and-strategic-dismantling.

[136] Bustillo, *First Afrikaners arrive in U.S. under radically redrawn refugee program*, *supra* note 131.

(continued…)

South Africa, seeking to flee that country for reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[137]

147.    On May 12, 2025, the first group of white South African refugees arrived in the United States under this program.[138] The review and approval of their applications was expedited; they were brought to the U.S. on a government-chartered flight; and they were greeted at Washington Dulles International Airport by government officials.[139] In explaining why these refugees were being allowed into this country while others were not, Deputy Secretary of State Christopher Landau said that Afrikaners "could be assimilated easily into our country,"[140] presumably because of their race.

148.    A few months later, President Trump announced that the refugee cap for 2026 would be reduced from 125,000 last year, to just 7,500 people—the majority of whom will be white South Africans.[141]

149.    And on February 26, 2026, Reuters reported that the "U.S. aims to process 4,500 refugee applications from white South Africans per month, far above President Donald Trump's stated refugee program cap, and is installing trailers on embassy property in Pretoria to support the effort."[142] The article explains that the "new target, contained in a previously unreported document

---

[137] Donald J. Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114121529754059509.

[138] Bustillo, *First Afrikaners arrive in U.S. under radically redrawn refugee program*, *supra* note 131.

[139] *Id.*

[140] *Id.*

[141] Rebecca Santana, *Trump limits annual U.S. refugees to 7,500. It'll be mostly white South Africans*, PBS News (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

[142] Ted Hesson & Nellie Peyton, *Exclusive: US aims to bring in 4,500 white South Africans per month as refugees, document says*, Reuters (Feb. 26, 2026), https://www.reuters.com/world/us-aims-bring-4500-white-south-africans-per-month-refugees-document-says-2026-02-26/. (continued…)

from the U.S. State Department dated January 27, signals a push to ramp up admissions from South Africa, while refugee applications from other areas have been severely curtailed."[143]

150.    In the early months of his second Administration, President Trump announced the creation of a separate policy favoring white and/or European immigrants: a new visa program that he calls the "gold card."[144] Under this program, noncitizens who, in President Trump's words, are "very high-level people" would be able to purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship.[145] This program will disproportionately reduce immigration barriers for white individuals: after the United States, Western Europe has the largest percentage (28 percent) of the world's millionaires.[146] Aside from the United States, the places with the highest proportion of millionaires per capita include Luxembourg, Switzerland, Australia, New Zealand, the Netherlands, and Denmark.[147]

---

[143] *Id.*

[144] Shawn McCreesh, *Trump Plans 'Gold Card' Alternative to Green Cards for 'High Level People'*, N.Y. Times (Feb. 25, 2025), https://tinyurl.com/2a7c9szj.

[145] Ryan Mac & Hamed Aleaziz, *Musk's Team Is Building a System to Sell 'Gold Card' Immigrant Visas*, N.Y. Times (Apr. 16, 2025), https://tinyurl.com/bdycjm6c.

[146] UBS, *Global Wealth Report 2024* 23 (2024), https://perma.cc/NST7-WZDR.

[147] *Id.*

(continued…)

151.    In addition to policies favoring white and European immigrants, the Administration has posted vivid iconography online that reflects those preferences:



Fig. A[148]          Fig. B[149]          Fig. C[150]          Fig. D[151]

## DEFENDANTS' DEFECTIVE PERIODIC REVIEW OF SOMALIA'S TPS DESIGNATION AND THE RESULTING TERMINATION DECISION

152.    On January 14, 2026, Defendants issued a notice in the Federal Register, terminating Somalia's TPS designation, effective 11:59 p.m. on March 17, 2026.[152] The Termination notice reveals that the periodic review and resulting termination of Somalia's TPS designation: (1) resulted from preordained, pretextual, and politically influenced decisions (i) to terminate TPS for Somalia, specifically, and (ii) to eliminate access to TPS for people from non-

---

[148] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, at 10:06 PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[149] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, at 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[150] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.

[151] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 16, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22.

[152] 91 Fed. Reg. 1,547.

European countries whose nationals are predominantly non-white; (2) involved unexplained and unreasonable changes in statutory interpretation and related changes in policies and practices for conducting periodic reviews of TPS designations; (3) violated the requirements of the TPS statute by (i) not undertaking required consultation with appropriate agencies, (ii) not undertaking a good faith and objective review of evidence of relevant country conditions, and (iii) impermissibly considering the Administration's understanding of domestic "national interest"; and (4) departed without explanation from past agency practice by (i) relying on domestic "national interest" as a basis for the Termination and (ii) only providing Somali TPS beneficiaries and their U.S.-based love ones a 60-day transition period before the effective date of the Termination.

***Preordained, Pretextual, and Unduly Politically Influenced Periodic Review***

153.    Congress deliberately crafted the TPS statutory scheme to solve the problem of political whims that had previously driven decision-making about humanitarian relief for immigrants in the U.S. for whom dire conditions in their countries of origin would render their return unsafe. *See supra* ¶¶ 56–57.

154.    Under the TPS statute, Congress tasked the DHS Secretary—not the President—with periodic reviews of TPS designations according to mandatory procedural requirements and related decisions to terminate designations. *See* 8 U.S.C. §§ 1254a(b)(3)(A)–(B).

155.    Nevertheless, on November 21, 2025—nearly two months before Defendant Noem's formal announcement of the Termination on January 14, 2026, through the Federal Register—President Trump posted on social media that *he* was terminating TPS for Somalis in Minnesota "effective immediately." *See supra* ¶¶ 1, 85.

156.    The President's post reflects his goal of eliminating TPS for Somalia, his disregard for the procedural requirements of the TPS statute, and his disregard for Congress's goal in

56

enacting the TPS statute: curbing the impact of presidential whims on access to country-based humanitarian immigration relief.

157. Repeated anti-Somali statements from the President—predating and spanning the periodic review period for Somalia's designation and beyond—further reflect his and Defendants' agenda to terminate Somalia's TPS designation. *See supra* ¶¶ 84–107.

158. The President has wrongly described TPS and its beneficiaries overall as "illegal," and he issued an executive order on his first day back in office that was intended, in part, to announce and drive restricted access to TPS, categorically. *See supra* ¶¶ 113, 115–16. Many statements from the President and his Administration, including Defendants, reflect a longstanding and ongoing goal of eliminating access to TPS for people from non-European countries whose nationals are majority non-white. *See supra* ¶¶ 108–24; *see also supra* ¶¶ 125–41 (rhetoric and policies reflecting discriminatory views about non-white, non-European immigrants); ¶¶ 142–51 (rhetoric and policies reflecting preferential treatment of white immigrants).

159. As an appointee of President Trump who serves under his authority and direction, Defendant Noem has hewed to the President's anti-TPS agenda—as reflected in her own statements to date maligning TPS and in her decisions to terminate TPS for every single designation so far that has been subject to periodic review during her tenure. *See supra* ¶¶ 114, 117, 119–24.

160. On information and belief, Defendant Noem's periodic review of Somalia's TPS designation and resulting decision to terminate it were unduly politically influenced by President

Trump, preordained, and involved pretextual justifications with no acknowledgment of the true reasons for the Termination as required by statute. [153]

***Unexplained Changes in Interpretation of the TPS Statute and in Related Policies and Practices for Periodic Reviews***

161.    The Administration departed from past agency practices for periodic reviews of TPS designations and instituted new policies and practices for them—without any corresponding acknowledgment or explanation to the public. On information and belief, these departures in policy and practice reflect an unexplained change in interpretation by DHS of the meaning and requirements of the periodic review and termination provisions of the TPS statute. These new interpretations are also unreasonable in light of the goals and text of the TPS statute.

162.    *Consultation:* The TPS statute requires consultation with appropriate agencies during periodic reviews of TPS designations. 8 U.S.C. § 1254a(b)(3)(A). Under past agency practices, the State Department was among the appropriate agencies whom the DHS Secretary would consult, by receiving and reviewing country conditions reporting and related recommendations from the State Department.[154]

---

[153] *See* 91 Fed. Reg. at 1,553; *cf. Saget*, 375 F. Supp. 3d at 346–53, 361–62 (postponing termination of TPS for Hait based on likelihood of success of APA claims that periodic review and resulting termination were preordained, pretextual, and politically influenced); *cf. also Afr. Cmmtys. Together v. Noem*, No. 1:25-cv-13939-PBS, 2026 WL 395732 at *9–11 (D. Mass. Feb. 12, 2026) *("ACT I")* (postponing termination of TPS for South Sudan based on likelihood of success of APA claim that periodic review and resulting termination were preordained and pretextual)*; Aung Doe v. Noem*, No. 1:25-cv-15483, 2026 WL 184544 at *13–21 (N.D. Ill. Jan. 23, 2026) (same with respect to TPS for Burma); Oral Order at 25, *Dahlia Doe v. Noem*, 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025), Dkt. 57 (same with respect to TPS for Syria).
[154] *See, e.g.*, GAO Report, *supra* note 18 at 2, 8, 16, 18, 23, 43; *see also, e.g.*, *Saget*, 375 F. Supp. 3d at 298–300 (describing customary practices for consultation during periodic reviews, including with State Department).
(continued…)

163.    By contrast, in email exchanges dated April 8, 2025, officials of USCIS noted that the Department of State would not be "provid[ing] country conditions [information] anymore."[155] On information and belief, this shift in practice reflects an unexplained change by DHS in its interpretation of its obligations under the TPS statute to consult appropriate agencies. *See* 8 U.S.C. § 1254a(b)(3)(A).

164.    DHS's unexplained change in interpretation is unreasonable. The State Department has unique insights into and expertise about humanitarian and human rights conditions in foreign states that map directly onto Congress's purpose in enacting the TPS statute.[156]

165.    It also reflects a preordained goal of skewing periodic reviews toward termination decisions, rendering the periodic review and resulting Termination of Somalia's designation pretextual.

166.    *Scope and Nature of Country Conditions Review:* Under the TPS statute, the DHS Secretary is supposed to undertake a good faith and objective review of available evidence of country conditions relevant to a given ground for the TPS designation.[157] Under past agency practice, USCIS would review available and objective evidence of country conditions that is relevant to legal grounds for TPS designation, including conditions different from or in addition to those considered during the initial designation on a given ground.[158]

---

[155] *See* MacLean Decl., Ex. 21 at 3, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-22; *see also id.*, Ex. 27 at 3, Dkt. 176-28 (March 21, 2025, email exchange involving USCIS officials and noting that "going forward State [Department] will no longer submit detailed COI [country conditions] reports").
[156] *See* GAO Report, *supra* note 18 at 2, 8, 16, 18, 23, 43.
[157] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 346.
[158] *See, e.g., Saget*, 375 F. Supp. 3d at 350 (the "DHS Secretary, DHS, and USCIS had a longstanding practice of considering all country conditions when undertaking the mandatory periodic review under the statute, regardless of their relation to the originating condition."). (continued…)

167.    By contrast, email exchanges dated February 28, 2025, reflect an unexplained shift in protocol for the scope of reviewable country conditions information: a USCIS official noted that as a matter of course for periodic reviews, DHS "is very focused on [country conditions] research that pertains directly to the original reason for a country's TPS designation and the ability for the U.S. to successfully return [people] to that country."[159]

168.    Further email exchanges dated February 19, 2025, involving USCIS officials reflect a practice of cherry-picking country conditions evidence reflecting purported "improvements" in the country: the email correspondence states that country conditions memoranda for consideration by Defendant Noem "should include additional information that would support different decision outcomes. For example, are there improvements that have been made in the country?"[160]

169.    On information and belief, both of these shifts in practice reflect an unexplained change in interpretation by DHS of the requirement in the TPS statute to undertake an objective and good faith review of relevant country conditions. *See* 8 U.S.C. § 1254a(b)(3)(A). That shift is not reasonable because it runs counter to the text and purpose of the TPS statute.

170.    Both unexplained shifts also reflect a preordained goal of skewing periodic reviews toward termination decisions, rendering the periodic review and resulting Termination of Somalia's designation pretextual.

171.    *Consideration of Domestic "National Interest" as a Basis for Termination*: Under past agency practices over a thirty-year span, prior DHS Secretaries customarily did not assert domestic "national interest" as a basis for terminating a TPS designation. This baseline is reflected

---

[159] *See* MacLean Decl., Ex. 14 at 5, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-15.
[160] *See id*. Ex. 15 at 3, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.) Dkt. 176-16.
(continued…)

in notices in the Federal Register announcing terminations of TPS designations, spanning 1992–2018, under agency leaders appointed by previous presidents and spanning party lines.[161]

172.    By contrast, Defendant Noem has asserted the national interest rationale in every announcement of a termination of a TPS designation based on the extraordinary-circumstances ground—including her termination of that basis for Somalia's TPS designation.[162]

173.    This unexplained departure from past agency practice is corroborated by email exchanges between USCIS officials dated February 28, 2025, which note that, as a matter of course, periodic reviews should look for data concerning overstays of non-immigrant visas by the nationals of the TPS-designated country and "fraud or vetting problem statistic[s]" concerning nationals of the TPS-designated country[163]—which are among the supposed "national interest" rationales that show up repeatedly in the relevant termination notices of Defendant Noem in the Federal Register, including the Termination notice for Somalia.[164]

174.    On information and belief, this departure from past agency practice reflects a change in interpretation by DHS of the provisions of the TPS statute. This selective fact-finding to support a preordained goal of terminating a TPS designation is unreasonable in three ways: it runs counter to the statute's procedural requirements, to its overarching purpose to protect foreign

---

[161] *See* Decl. of Golnaz Fakhimi, *African Communities Together v. Noem*, No. 1:25-cv-13939-PBS (D. Mass. Dec. 23, 2025) ("*ACT I*"), Dkt. 8-7 at 19–29 (Ex. 15, Decl. of Aaron Reichlin-Melnick) (elucidating that review of the 35-year history of TPS demonstrates that, before 2025, the sole rationale cited to justify termination of TPS had been an end to the temporary country conditions which authorized the initial designation).

[162] *See* 91 Fed. Reg. at 1,550–53. Defendant Noem's nine other announcements citing to purported domestic "national interest" as a basis for terminating TPS designations based on extraordinary circumstances concern the TPS designations of these countries: Ethiopia, South Sudan, Cameroon, Haiti, Burma, Afghanistan, Syria, Yemen. The nationals of four of these nine countries are majority Black and either African or descended from Africans.

[163] *See* MacLean Decl., Ex. 14 at 5, *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-15.

[164] *See* 91 Fed. Reg. at 1,550–53.

nationals from ongoing conditions of insecurity in their home countries, and to accomplish Congress's goal of curbing the influence of presidential whims on access to country-based humanitarian immigration protection. *See* 8 U.S.C. § 1254a(b)(1)(C) (designations based on extraordinary circumstances); *id.* § 1254a(b)(3)(A) (periodic reviews); *id.* § 1254a(b)(3)(B) (terminations of designations); *see also supra* ¶¶ 56–57, 61–62.

### *Failure to Consult with Appropriate Agencies*

175. Customarily within periodic reviews of a TPS designation, the Secretary relies on both USCIS and the State Department's prepared country conditions memoranda and recommendations.[165]

176. Somalia's Termination notice does not mention any agency by name that the Secretary consulted during the periodic review process, describe the content of any consultations, nor mention who or what was considered during those consultations. Rather, the notice merely includes boilerplate language that the Secretary "consult[ed] with appropriate U.S. Government agencies."[166]

177. That boilerplate language is belied by what the Termination notice does not otherwise say or reference.

178. Significantly, on May 14, 2025, the State Department issued a Level 4 Travel Advisory concerning Somalia, indicating extremely unsafe conditions there.[167] However, neither this advisory nor the conditions it references are mentioned anywhere in the Termination notice.[168]

---

[165] *See, e.g.*, GAO Report, 18 at 2, 8, 16, 18, 23, 43; *Saget*, 375 F. Supp. 3d at 346.
[166] *See generally* 91 Fed. Reg. 1,547.
[167] U.S. Dep't of State, *Somalia Travel Advisory* (May 14, 2025), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/somalia-travel-advisory.html.
[168] *See* 91 Fed. Reg. at 1,543.
(continued…)

179.     Prior notices, by contrast, did refer explicitly to country conditions information from the State Department that formed a critical part of the periodic review process.[169] The Termination notice does not explain its departure from the past agency practice of consulting with that agency and relying on its country conditions reports.[170]

180.     Even assuming Defendant Noem had not instituted categorical changes in policies and practices for how periodic reviews are conducted, on information and belief, she nevertheless did not undertake required consultation with the State Department or other appropriate agencies during her periodic review of Somalia's TPS designation.

**_Failure to Undertake Statutorily Required, Good Faith, Objective Review of Relevant Country Conditions_**

181.     Defendant Noem failed to undertake a good faith review of available and objective evidence of current country conditions in Somalia relevant to its two based for TPS designation: ongoing armed conflict and other extraordinary and temporary conditions.[171]

182.     _Omission of and Disregard for Evidence of Unsafe Conditions Reported by the Executive Branch_: With respect to the armed conflict basis for Somalia's TPS designation, the Termination notice fails to review available and objective evidence of unsafe conditions in Somalia, including evidence reported _from within the Executive Branch_.

183.     Notably, the Termination does not mention that on April 8, 2025, President Trump himself renewed recognition of Somalia's "national emergency" status under the International

---

[169] _See, e.g._, 89 Fed. Reg. at 59,138 (through four footnotes, referencing: U.S. Dep't of State, _2023 Country Reports on Human Rights Practices: Somalia_ (2024), https://www.state.gov/wp-content/uploads/2024/02/528267_SOMALIA-2023-HUMAN-RIGHTS-REPORT.pdf); 88 Fed. Reg. 15,434 at 15,437–38 (referencing State Department sources in six footnotes).

[170] _Compare generally_ 91 Fed. Reg. 1,547, _with, e.g._, 89 Fed. Reg. at 59,138; GAO Report at 15–21.

[171] _Cf._ 8 U.S.C. § 1254a(b)(3)(A); _see also, e.g._, _Saget_, 375 F. Supp. 3d at 346, 350. (continued…)

Emergency Economic Powers Act, citing to the "deterioration of the security situation and persistence of violence of Somalia" that is "committed against civilians" there and attributable to Al-Shabaab.[172] And the notice does not otherwise explain why or how such conditions are consistent with safe return for Somali nationals.[173]

184. Nor does the Termination notice review or acknowledge the Level 4 travel advisory that the Department of State published on May 14, 2025—which emphasizes that "violence and explosive attacks can happen anywhere in Somalia, at any time" and that armed groups "continue to plot kidnappings, bombings, and other attacks in Somalia… with little or no warning," targeting nearly every public space, from airports, seaports, hotels and restaurants, shopping areas, public places that attract large crowds and tourists, and government, military, and other convoys.[174] The Termination notice does not explain why or how such conditions that make even temporary travel to Somalia ill-advised could be consistent with safe return there for its nationals.[175]

185. The absence of both sources from the notice reflects an unexplained departure from past agency practice, through which other DHS Secretaries had reviewed comparable evidence.[176] And it otherwise reflects pretext from Defendants here: asserting the possibility of supposedly safe return for purposes of the Termination, while sounding alarm elsewhere to caution against even temporary travel to Somalia.

---

[172] *Compare generally* 91 Fed. Reg. at 1,547–53, *with* Continuation of the National Emergency With Respect to Somalia, 90 Fed. Reg. 15,391 (Apr. 10, 2025).
[173] *See* 91 Fed. Reg. at 1,547–53.
[174] U.S. Dep't of State, *Somalia Travel Advisory*, *supra* note 167.
[175] *See* 91 Fed. Reg. at 1,547–53.
[176] *Compare* 91 Fed. Reg. at 1,547–53, *with* 89 Fed. Reg. at 5,9137–38 (reviewing evidence of threats to safety that al-Shabaab and other armed groups pose), *and* 88 Fed. Reg. at 1,5437 (same).

186.    *Cherry-Picked Evidence Concerning Areas of Somalia Supposedly Safe for Return:* In support of its termination of Somalia's armed conflict designation for TPS, the Termination notice asserts the possibility of safe return to Somalia categorically or in given parts of the country, relying either on subjective statements or on cherry-picked content from sources that otherwise contain objective evidence of unsafe conditions.

187.    For example, the Termination notice states that Somalia "is no longer experiencing an ongoing armed conflict" but points only to selective, subjective, unsubstantiated statements by the Somali President at the United Nations about Somalia's transition away from the civil conflict, without any consideration of the nature or context of the source.[177]

188.    The Termination notice likewise asserts that "requiring Somali nationals to return to Somalia would not pose a serious threat to their personal safety as there are areas within Somalia where Somali nationals may live in safety." It suggests, as an example, Somaliland, which declared independence from Somalia in 1991, characterizing it as a supposed "oasis" for stability in a turbulent region.[178] Defendant Noem cites to a January 2025 Council of Foreign Relations report to support that assertion.[179] However, Defendant Noem fails to acknowledge that the same report further elaborates that Somaliland will struggle without broad international recognition or a compromise with Somalia and that diplomacy will also "likely to be complicated by Somalia's ongoing battle against al-Shabaab Islamist insurgent group, as well as deteriorating security and

---

[177] *See* 91 Fed. Reg. at 1,549.

[178] *Id.* at 1,549 n. 40 (citing European Union Agency for Asylum, *Country of Origin Information Report—Somalia: Country Focus* (May 2025), https://www.euaa.europa.eu/publications/coi-report-somalia-country-focus ("EUAA May 2025 Somalia Report")).

[179] 91 Fed. Reg. at 1,549 n. 40 (citing Council on Foreign Relations, *Somaliland: The Horn of Africa's Breakaway State* (Jan. 21, 2025), https://www.cfr.org/ backgrounder/somaliland-horn-africas-breakaway-state).

(continued…)

stability in the broader Horn of Africa region."[180] The Termination notice does not cite to these portions of the report, nor explain why they are irrelevant to the statutory consideration of the safety of returning nationals.

189.    Defendant Noem characterizes Puntland as another destination within Somalia where Somali nationals supposedly can safely return, relying on a report by the European Union Agency for Asylum ("EUAA").[181] However, that same report discusses how armed groups in Puntland forcibly "continued to recruit children." and how repeated forms of female-genital mutilation are rampant there.[182] The Termination notice does not review these portions of the report, nor explain why they are irrelevant to the statutory consideration of the safety of returning nationals.

190.    Likewise, the Termination notice cites the United Nations High Commissioner for Refugees ("UNCHR") in asserting that "parts of the country are suitable" for the return of Somali nationals.[183] However, a more fulsome review of that source reveals widespread internal displacement driven by drought, floods, conflict, and other precarity, across multiple regions.[184] The Termination notice does not review these data, nor explain why they would be irrelevant to the statutory consideration of the safety of returning nationals.

191.    The evidence of ongoing armed conflict and other extraordinary circumstances lurking within the sources that Defendant Noem cited in the Termination notice are relevant to

---

[180] Council on Foreign Relations, *Somaliland: The Horn of Africa's Breakaway State, supra* note 179.

[181] EUAA May 2025 Somalia Report, *supra* note 178 at 25, 37–38.

[182] *Id.* at 26, 37.

[183] 91 Fed. Reg. at 1,549 n. 41 (citing U.N. High Comm'r for Refugees (UNHCR), *Somalia Internal Displacement* (Sep. 8, 2017), https://data.unhcr.org/en/dataviz/1?sv=1&geo=192) ("UNHCR Somalia Internal Displacement 2017") (last updated Feb. 2026).

[184] *See* UNHCR Somalia Internal Displacement 2017, *supra* note 183.

(continued…)

considerations assessed within prior periodic reviews of Somalia's TPS designation.[185] Although the Termination notice does acknowledge some of these conditions, it only does so to present them against supposed "improvements" in conditions.

192.    These discrepancies between Defendant Noem's stated rationales within the Termination notice and the contents of the evidence she claims to have reviewed indicate pretext and a preordained goal of concluding safe return is possible for Somalis to Somalia.

193.    *Cherry-Picked Evidence of Supposed "Improvements":* The Termination notice demonstrates the same pattern as to the extraordinary conditions ground for Somalia's TPS designation. It points to supposed economic improvements in Somalia, but information from the same sources Defendant Noem cites contradict that premise.[186] And the notice's review of conditions including climatic shocks, food insecurity, and violence from armed groups departs without explanation from prior DHS Secretaries' review of comparable conditions.

194.    The Termination notice acknowledges "ongoing challenges" in Somalia relevant to the extraordinary circumstances basis for its TPS designation, stating that: "In a recent press briefing, the United Nations Secretary-General spokesperson stated: 'severe drought in the country is putting millions of people's lives at risk' and 'approximately 3.4 million people in Somalia are

---

[185] *Compare* 91 Fed. Reg. 1,549, 1,552, *with*

[186] *Compare* 91 Fed. Reg. at 1550 (asserting "building boom" without explaining its putative relevance to statutory consideration of safe return and citing *Rising From The Ashes: Mogadishu's Building Boom*, Barron's (Nov. 23, 2025) https://www.barrons.com/news/rising-from-the-ashes-mogadishu-s-building-boom-53c34085?reflink=desktopwebshare_permalink), *with Rising From the Ashes: Mogadishu's Building Boom* ("Al-Shabaab has retaken some 200 villages in a surge around the capital this year" . . . "'Wealthy officials and foreigners may enjoy increased security and living standards, but 'that is completely different from the day-to-day experience of people in other parts of the city'").
(continued…)

currently experiencing high levels of acute food insecurity.'"[187] The notice further acknowledges that al-Shabaab "continues to exploit the Somalian government's limited state capacity and the country's dire humanitarian crises to launch indiscriminate attacks against government forces, foreign peacekeepers, and civilians."[188]

195.    Nevertheless, the Termination notice concludes that Somalia has supposedly made "significant progress" in its governance, security, and economic management, citing a "building boom" in the capital Mogadishu.[189] But a source that Defendant Noem cites in the Termination notice contradicts this assertion by discussing Al-Shabaab's stronghold over Mogadishu, including in "collecting taxes on large and small businesses on the big markets of the city and also from individuals building houses or shops."[190]

196.    Secretary Noem also failed to consider a U.N. Secretary General report and other objective and available sources that provides a contrasting perspective on the economic developments and ongoing reforms in Somalia. For example, the U.N. report notes that Somalia's "economic outlook is clouded by climate shocks, slow domestic revenue growth and emerging challenges in global trade and aid policy, including a rapid decline in official development assistance."[191]

197.    The Termination notice did not review competing narratives on Somalia's conditions within sources that Defendant Noem herself cited or otherwise within other objective

---

[187] 91 Fed. Reg. at 1,549; *id*. at n.42 (citing U.N., Daily Press Briefing by the Office of the Spokesperson for the Secretary- General (Nov. 13, 2025), https://press.un.org/en/2025/db251113.doc.htm.
[188] *Id*. at 1,549.
[189] *Id*.
[190] EUAA May 2025 Somalia Report, *supra note* 178 at 100.
[191] U.N. Sec. Council, *Report of the Secretary-General on Somalia* 3 (Sep. 30, 2025), https://docs.un.org/en/S/2025/613.
(continued…)

evidence she apparently did not review but that is relevant to the statutory consideration of safe return and analogous to evidence that prior DHS Secretaries did review.[192]

198.    Discrepancies between Defendant Noem's stated rationales within the Termination notice, the actual contents of the evidence she claims to have reviewed, and the available and objective evidence she appears not to have reviewed indicate pretext and a preordained goal of concluding safe return is possible for Somalis to Somalia.

***Impermissible Consideration of the Administration's Construction of Domestic "National Interest"***

199.    <u>*Statutory Construction and Past Agency Practice:*</u> Congress categorically omitted consideration of domestic "national interest" from periodic reviews of TPS designations. It textually limited periodic reviews to consideration only of the "conditions in the foreign state" for which "a designation is in effect," in order to determine "whether the conditions for such designation . . . continue to be met." *See* 8 U.S.C. § 1254a(b)(3)(A).

200.    Likewise, Congress omitted reference to domestic "national interest" from the provision governing terminations of TPS designations. That provision states that if the DHS Secretary determines that "*a foreign state* no longer continues to meet" the "conditions for designation," the DHS Secretary "shall terminate" the designation. *See* 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

201.    Both periodic reviews and resultant terminations of TPS designations turn on the "conditions" in the foreign state—which are the "conditions" for designation.

---

[192] *Compare* 91 Fed. Reg. 1,547, *with* 89 Fed. Reg. 59,135 (citing ongoing armed conflict, floods, droughts, food insecurity, and disease outbreaks), *and* 88 Fed. Reg. 15,434 (citing ongoing armed conflict, droughts, floods, disease outbreaks, malnutrition, food insecurity, gender-based violence, and recruitment of child soldiers).

202. As discussed above, the TPS statute defines three grounds for a TPS designation: one based on ongoing armed conflict, one based on environmental disaster, and one based on extraordinary and temporary conditions rendering return unsafe. *See* 8 U.S.C. §§ 1254a(b)(1)(A) (armed conflict); *id*. § 1254a(b)(1)(B) (environmental disaster); *id*. § 1254a(b)(1)(C) (extraordinary and temporary conditions).

203. Of those three grounds for TPS designation, *only one* refers in any way to domestic "national interest": the extraordinary circumstances ground.

204. Its text provides that the DHS Secretary "may designate" if she finds that "there exist extraordinary and temporary conditions in the foreign state that prevent" people "who are nationals of the state from returning to the state in safety**, unless** the [DHS Secretary] finds that permitting" the people "to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C) (emphases added).

205. The structure of the provision makes clear that the text preceding "unless" concerns the "conditions" for designation, which are the relevant ones in the foreign state. By contrast, the DHS Secretary's ability to consider domestic "national interest"—defined in the text that follows "unless"— functions *not* as a "condition" for designation *but as an exception to it*.

206. This reading of the statute is consistent with past agency practice concerning periodic reviews and resulting terminations of TPS designations. Prior to 2025, prior DHS Secretaries had not invoked their administration's views of domestic "national interest" as the basis for any termination. *See, e.g., supra* ¶ 171.

207. By contrast, Defendant Noem has invoked a "contrary to national interest" rationale to justify the termination of every single TPS designation based on the extraordinary circumstances ground in the statute—impacting, so far, designations for Somalia, South Sudan, Ethiopia,

Cameroon, Haiti, Burma, Afghanistan, Syria, and Venezuela—and doing so without explaining the shift in agency practice.

208.    *Pretextual Assertion of Supposed "National Interest" Within the Termination Notice for Somalia's TPS Designation:* The Secretary's assertions of "national interest" in the Termination notice appear to be boilerplate language lifted directly from prior TPS termination notices.[193] The Termination Notice includes references to data that are either unsubstantiated or irrelevant to Somali TPS beneficiaries, belying Defendant Noem's asserted "national interest" rationales.

209.    In the Termination Notice, Defendant Noem claims that there are Somali nationals (or non-citizens who last habitually resided in Somalia) "who are [TPS] beneficiaries or applicants who are or have been subject the subject of administrative investigations for fraud, public safety, and national security," citing to fraud and public safety violations as contrary to the national interest.[194]

210.    There is no reference to where these individuals are located or how many there purportedly are.[195] Of the case examples Defendant Noem does provide, none are TPS holders and some include alleged federal prosecutions of individual U.S. citizens Somali-Americans from over a decade ago.[196]

211.    Nearly every one of Defendant Noem's asserted national interest justifications collapses into a core theme: alleged deficiencies in vetting and screening that she purports make it "virtually impossible" to confirm eligibility for the Somali community. For example, Defendant

---

[193] *See, e.g.*, 90 Fed. Reg. 50,484, 50,486 (South Sudan); 90 Fed Reg. 45,398, 45,401 (Syria); 90 Fed. Reg. 20,309, 20,311 (Afghanistan); 90 Fed. Reg. 54,733, 54,737 (Haiti).
[194] 91 Fed. Reg. at 1,551.
[195] *Id.*
[196] *Id.* at 1,551–52.

71

Noem asserts a supposed "national interest" relating to the rate of overstays of Somali nationals with B-1 and B-2 visas and exchange visitors (F, M, J)—i.e. Somali nationals who do not hold TPS.

212. Defendant Noem makes no effort to explain what if any correlation those overstay rates have with the periodic review for Somalia or how they implicate the "national interest" she has asserted in reviewing Somalia's designation for TPS. Nor does Defendant Noem explain how her reliance on this rationale squares with Congress's deliberate decision *not* to condition individual TPS eligibility on having a particular, or any, immigration status. *See* 8 U.S.C. § 1254a(c) (setting out eligibility requirements).

213. Additionally, the asserted rationale concerning visa overstay rates does not appear to be the true rationale behind this decision—since, as described above, the Administration's immigration-related policy changes have not targeted countries whose nationals are majority white and European or descended from Europeans—such as the United Kingdom or Canada—whereas nationals of countries with very low numbers of overstays—mostly Muslim countries whose nationals are not descended from Europeans and African countries whose nationals are majority Black—are.[197]

214. Defendant Noem also repeatedly refers to unsubstantiated claims[198] that members of the Somali community in Minneapolis—the largest Somali community outside of Africa[199]—

---

[197] Margy O'Herron & Doug Rand, *New Entry Bans, Same Faulty Reasoning*, *supra* note 133.

[198] Clay Masters, *Minnesota Somali community bears brunt of Trump administration policies*, NPR (Jan. 3, 2026), https://www.npr.org/2026/01/03/nx-s1-5662619/minnesota-somali-community-bears-brunt-of-trump-administration-policies; *see also* Press Release, *AG Brown issues statement on reports of harassment of daycare providers* (Dec. 30, 2025), https://www.atg.wa.gov/news/news-releases/ag-brown-issues-statement-reports-harassment-daycare-providers.

[199] Andrew Hazzard, *How Minnesota became the center of the Somali diaspora*, Sahan Journal (Dec. 10, 2025), https://sahanjournal.com/immigration/somali-history-in-minnesota/.

72

have engaged in public benefits fraud and money laundering and fails to cite any objective evidence for these claims. Neither issue has any bearing under the TPS statute on whether safe return to Somalia is possible for its nationals or whether the conditions warranting TPS designation continue to exist there.

215.    The Termination Notice fails to consider or explain the relevance of these national interest considerations to Somali TPS holders or applicants. TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases),or who are inadmissible on grounds relating to national security, foreign policy, or on many other bases.[200]

216.    The Termination notice does not explain how or why the stringent individual eligibility criteria for obtaining and maintaining TPS, and the related, stringent vetting and screening to which applicants are subject, are insufficient to address Defendant Noem's stated concerns regarding domestic "national interest." Further, Defendant Noem's statement in the Termination Notice that vetting is "virtually impossible" conflicts with existing TPS screening mechanisms, continuous re-registration requirements, and biometric and background checks that are baked into getting and maintaining TPS holder status.

***Unexplained Departure from Past Agency Practice of Orderly Transition Periods***

217.    The Termination notice here was published a mere 60 days prior to the effective date,[201] the minimum required under the statute. This is a significant and unexplained departure from established policy and practice, prior to 2025, and including during President Trump's prior term, of affording more orderly transition period of 6 months or longer—and typically 12 to 18

---

[200] 8 U.S.C. §§ 1254a(c)(1)(A), (c)(2)(B); *id.* § 1182; *id.* § 1158(b)(2)(A).
[201] 91 Fed. Reg. at 1,552.
(continued…)

months.[202] The longer period permitted TPS beneficiaries and their families and communities to more easily navigate the immense physical, social, economic, administrative and other transitions that may be involved with loss of TPS status.

## EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR SOMALIA IS TERMINATED IMMINENTLY AND UNLAWFULLY

218.    Defendants' decision to terminate TPS imminently and unlawfully for Somalia would strip TPS status from an estimated 1,082 Somali TPS recipients, including the Individual Plaintiffs and other members of Plaintiffs ACT and PANA; revoke access to TPS and to related benefits available to applicants with prima facie eligibility for TPS, for at least 1,383 Somali nationals with pending applications for TPS; and cause significant hardship for the U.S. citizen and lawful permanent resident dependents and immediate relatives of recipients and applicants. Some of these people, such as the Individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities. If Defendants' unlawful and imminent Termination were to take effect as of 11:59 p.m. on March 17, 2026, the resulting harms would be myriad and severe.

219.    For Somali TPS beneficiaries, including all of the Individual Plaintiffs and other members of ACT and PANA, those harms can include: immediately losing TPS as a sole source of immigration status and related eligibility for federal benefits (such as work authorization) and state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; facing forced removal to Somalia and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning climatic shocks, mass internal displacement, acute food insecurity,

---

[202] *See* Transition Periods Chart, *supra* note 23.

and barriers to accessing humanitarian aid and lifesaving medical treatment; or facing forced removal to unsafe third countries.

220.    For Somali TPS applicants, including Plaintiff Alexander Doe and other members of ACT and PANA, the harms include no longer having any basis for consideration of their pending application for TPS.

221.    For the Individual Plaintiffs, other members of ACT and PANA, and all other Somali TPS beneficiaries and their U.S.-citizen family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the current TPS beneficiaries could face grave harm, including death, if forcibly removed to Somalia.

222.    The most immediate harms the Termination would cause are automatic loss of TPS status and access to related benefits.

223.    TPS beneficiaries (including applicants) reliant on TPS for work authorization would automatically lose employment eligibility because of the Termination. This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders and applicants risk losing their homes or other material assets, leading to further economic harm. And TPS beneficiaries and their families would also lose employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security, TPS holders also face the loss of that crucial benefit.

224.    Take Plaintiff Mohamed Doe, for example. His sole immigration status is TPS, on which he relies for work authorization: earning his livelihood as a beloved teacher. He depends on his livelihood to support himself and his wife, with their first baby on the way. If the Termination takes effect imminently and unlawfully, he will lose the critical ability to earn a lawful income, at a time when his blossoming family needs it most.

225. TPS beneficiaries (including applicants) who are reliant on TPS for driver's license eligibility would automatically become ineligible for that benefit as a result of the Termination—losing related mobility and freedom of movement—because, in many states, driver's licenses and state-issued identification are limited to those with lawful immigration status.[203]

226. For example, consider Plaintiff Tyson Doe, who is also a beloved teacher. The town where he lives does not have public transit, and he relies on his TPS-based driver's license to be able to get around by car to take care of virtually all the needs of his daily life, like getting to the elementary school where he teaches, buying groceries, and attending mosque.

227. All of the harms of the Termination compound because of how the Administration has only provided a 60-day wind-down period to Somali TPS beneficiaries, which is insufficient for them and their families to be able to plan adequately for their futures and which starkly departs from a longstanding agency practice of more orderly transition periods of at least 6 months but more typically 12–18 months.

228. The insufficiency of the 60-day wind-down period is compounded by a myriad of severe and new policy changes within DHS that restrict access to alternative forms of immigration status in the U.S., both affirmatively and defensively (within removal proceedings).

229. A November 27, 2025, policy change of USCIS requires "significant, negative" consideration of "country-specific" factors in the review of any pending or newly filed application for any discretionary USCIS immigration benefit. This policy change refers, illustratively, to the sorts of "country-specific factors" referenced in the entry bans the President instituted effective June 9, 2025, which extend to Somali nationals. *See supra* ¶ 135.

---

[203] *See, e.g.*, *REAL ID Checklist*, California Dep't of Motor Vehicles, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

230. A December 2, 2025, set of policy changes from USCIS announced (1) a blanket pause on the adjudication of affirmative asylum applications and (2) a blanket pause on the adjudication of other immigration benefits applications for applicants otherwise subject to the entry bans instituted effective June 9, 2025—which includes Somali applicants. *See supra* ¶ 136.

231. A January 21, 2026, policy of the U.S. Department of State has indefinitely paused the issuance of immigrant visas (entry permits) to the nationals of over 75 countries, including Somalia and 34 other countries that are African or whose nationals are majority Black and descended from Africans. *See supra* ¶ 139.

232. The blanket USCIS pause on asylum adjudications that is currently in place renders virtually impossible any affirmative access to asylum for Somali TPS holders and/or applicants, ahead of the March 17, 2026, termination date for TPS for Somalia.

233. The blanket USCIS pause on the adjudication of other immigration benefits applications filed by Somalis renders virtually impossible any access they have to any other immigration status, ahead of the March 17, 2026, termination date for TPS for Somalia. Even if the pause were to lift, the November 27, 2025, USCIS policy indicates that Somali nationality alone may precipitate denials of applications. Additionally, the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which another form of active legal status is a prerequisite.[204]

234. Any current beneficiary of TPS for Somalia (holder or applicant) against whom immigration enforcement precipitates because of the imminent and unlawful Termination of Somalia's TPS designation would necessarily begin experiencing harms that Congress wanted

---

[204] *See* American Immigration Council, *Temporary Protected Status: An Overview* (Nov. 25, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/ (noting some TPS recipients may be eligible to adjust status).

them *to avoid*. *See* 8 U.S.C. §§ 1254a(1)(A) (protection from deportation), (d)(4) (protection from immigration confinement); 8 C.F.R. § 244.10(e) (protections extend to given applicants).

235.    Harms arising from immigration enforcement would compound because of how the Administration is aggressively seeking to alter access to standard removal proceedings by, instead, leaning hard into an expansive interpretation of its statutory authority to undertake expedited removals with few, if any, procedural rights for the targeted individuals. *See, e.g.*, *Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, *14 (D.C. Cir. Nov. 22, 2025) (litigation challenging DHS policy expanding the scope of expedited removal).

236.    Even within standard removal proceedings, the Administration has otherwise severely constrained access to asylum through a litany of restrictive policies,[205] including policies specifically targeted against Somalis.[206]

237.    Moreover, Congress established TPS as a form of humanitarian protection that *does not turn* on *individualized* persecution and harm, the way that asylum and related forms of protection do and which not all TPS holders and applicants may be able to establish.

238.    TPS holders, including all the Individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[207]

---

[205] Nat'l Immigr. Project and Ctr. for Gender and Refugee Studies*, Practice Advisory – Fighting for a Day in Court: Understanding and Responding to Pretermission of Asylum Applications* (updated Aug. 27, 2025), https://nipnlg.org/sites/default/files/2025-07/advisory-avoiding-pretermission.pdf; Nat'l Imm. Justice Ctr., *Practice Advisory – Applying for Asylum After Matter of R-E-R-M- & J-D-R-M- and Matter of S-S-F-M-* (updated Oct. 2025), https://immigrantjustice.org/wp-content/uploads/2025/05/Updated-AG-Decisions-Practice-Advisory-Final_Asylum_Oct2025.pdf.

[206] Bustillo, *Immigration courts fast-track hearings for Somali asylum claims*, *supra* note 131.

[207] 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(i)(II).

239. The entry bans President Trump instituted June 6, 2025, and that apply to Somalis, separately frustrate, if not obviate, the possibility of return to the U.S. for current Somali TPS holders and applicants who leave the U.S. due to the Termination.

240. Furthermore, TPS holders who may be entitled to a fear-based form of immigration relief in the U.S.—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward. *Id.*

241. The risk of deportation anywhere renders TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many Somali TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind, potentially without the ability to reunite with them in the U.S., or bringing their U.S. citizen children (or other family members) to a country that is unsafe, where the children have never lived and, in many cases, have never even visited due to the safety risks there.

242. Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Somali TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the

Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date of the Termination approaches.

243. Take Plaintiff Alexander Doe, for example. He has been panicked since learning of the Termination: afraid of forced return to unsafe conditions in Somalia and trying to resign himself to the possibility that his hard work pursuing two associate's degrees at once, with his graduation to take place within a few months, may be tragically erased because of the Termination.

244. Like Alexander, Plaintiff Nina Doe is in her twenties and is also an educator. She has been feeling terrified since learning of the Termination. She is terrified of being "rounded up, kidnapped, and taken to an ICE detention center far away from my family, my community, and my loved ones." And she fears a lot of unsafe conditions in Somalia, including sexual and gender-based violence there.

245. All Somali TPS beneficiaries have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, and national-origin discrimination.

246. Plaintiff Tyson Doe, like all of the Individual Plaintiffs, is also an educator. And through that lens he sees chilling historical parallels in his own recent experiences: "In my time in the U.S., I've not witnessed the administration have this level of racism and hate towards any other group. I am being constantly demonized simply for being Somali. To be Somali in the United States today feels like what I imagine it was like to be Japanese in the United States in 1942."

## CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of classes defined as follows:

248. All nationals of Somalia or individuals without any nationality who last habitually resided in Somalia who are present in the U.S. and are current recipients or holders of TPS for Somalia (the "Recipient Class"); and

249. All nationals of Somalia or individuals without any nationality who last habitually resided in Somalia who are present in the U.S. and have pending applications for TPS for Somalia that reflect their *prima facie* eligibility for it (the "Applicant Class").

250. The proposed classes are each sufficiently numerous so as to make joinder of all members impracticable. Based on Defendants' own accounting in the Federal Register notice, the Recipient Class consists of approximately 1,082 current TPS holders, and the Applicant Class consists of approximately 1,383 TPS applicants. *See* 91. Fed. Reg. at 1,552.

251. There are questions of law and fact common to the classes, including:

252. Whether Defendants' periodic review of Somalia's TPS designation and resulting Termination were preordained, pretextual, and/or unduly politically influenced by President Trump—without good faith regard to objective evidence of country conditions and prior to consulting with other appropriate agencies, in violation of the TPS statute and APA;

253. Whether Defendants' periodic review of Somalia's TPS designation and resulting Termination resulted from Defendants' broader, preordained, pretextual goal of restricting access to TPS for non-European countries whose nationals are predominantly non-white—driven by the undue political influence of President Trump;

254. Whether the TPS statute authorizes the Secretary to consider the Administration's determination about the "national interest" as a sole justification to terminate a TPS designation;

81

255.    Whether Defendants' decision to terminate Somalia's TPS designation was impermissibly motivated by discriminatory intent or animus based on race and national origin, in violation of the Fifth Amendment;

256.    Whether Defendants' failure to provide more than the minimum 60-day notice before terminating Somalia's TPS designation violates the APA as an unexplained departure from past agency practice in violation of the APA; and

257.    Whether Defendants' reliance on the Administration's determination about the domestic national interest in terminating Somalia's TPS designation deviates from past agency practice in violation of the APA.

258.    Plaintiffs' claims are typical of those of the Recipient and Applicant classes.

259.    Plaintiffs will fairly and adequately protect and represent the interests of the Recipient and Applicant classes. The interests of the Plaintiffs are not antagonistic to the classes.

260.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

261.    Defendants' unlawful termination of TPS for Somalia applies generally to the entire class, such that class-wide relief is appropriate.

## CAUSES OF ACTION

**COUNT ONE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A), (C)**
**Contrary to Law; In Excess of Statutory Authority; Arbitrary and Capricious**
*Preordained, Pretextual, and Unduly Politically Influenced Agency Action*
**(All Plaintiffs Against All Defendants)**

262.    Plaintiffs incorporate by reference the above allegations.

263.    The APA, 5 U.S.C. § 701 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency

82

action, or adversely affected or aggrieved by agency action." *Id.* § 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "not in accordance with law," *id.* § 706(2)(A), "arbitrary and capricious," *id.*, or "in excess of statutory authority," *id.* § 706(2)(C).

264. Defendant Noem's periodic review process and the resulting Termination of Somalia's TPS designation constitute "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the Plaintiffs' loss of TPS "automatically and without further notice or right of appeal."[208]

265. Here, the periodic review and resulting Termination are contrary to the TPS statute and in excess of the authority it provides Defendant Noem because they were driven by a preordained, pretextual decision to terminate TPS for Somalia, specifically, as part of Defendants' broader effort to eliminate access to TPS more broadly for non-European, non-white immigrants. *See, e.g., Saget*, 375 F. Supp. 3d at 345–46; *ACT I*, 2026 WL 395732, at *9–11.

266. The preordained decision to terminate Somalia's TPS designation was driven by the undue political influence of President Trump, Defendants and other senior government officials—reflecting anti-Somali and anti-immigrant sentiment and categorical disregard for TPS and its largely non-European and non-white beneficiaries.

267. Defendants' and other federal officials' anti-Somali sentiments are reflected in their words and actions prior to, during, and after the periodic review of Somalia's TPS designation, as described above, including making disparaging statements about Somalis and ordering expanded

---

[208] 8 C.F.R. § 244.19.

ICE enforcement activities in predominantly Somali communities in the U.S based on biased and misleading allegations.

268.    Defendants' decision-making regarding the periodic review process and Termination reflect the preordained goal of terminating TPS for Somalia at all costs, in line with Defendants' pattern of terminating each of the thirteen TPS designations that has been up for periodic review to date and whose non-European, non-white beneficiaries Defendants disfavor.

269.    The periodic review and resulting Termination of Somalia's TPS designation were also arbitrary and capricious because the rationale that Defendant Noem provided to the public about them through her Termination notice—encompassing her explanations of what she considered during the periodic review, what information she considered, and what justified the Termination—failed to consider objective and available evidence to the contrary, indicating  they were pretextual and do not reflect a sufficient periodic review process or her true reasons for the Termination as required by statute.

270.    Plaintiffs will suffer irreparable harm if the resulting Termination is not postponed ahead of its March 17, 2026, effective date and ultimately vacated and set aside.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
*Unexplained Change in Interpretation of the TPS Statute and in Related Policies and*
*Practices for Periodic Review of TPS Designations*
**(All Plaintiffs Against All Defendants)**

271.    Plaintiffs incorporate by reference the above allegations.

272.    To effectuate their preordained agenda of terminating TPS for Somalia and of curtailing access to TPS overall, Defendants undertook an unexplained change in their

84

interpretation of the TPS statute, 8 U.S.C. § 1254a, and undertook related, unexplained changes in their policies and practices for conducting periodic reviews and for terminating TPS designations.

273. Prior to the shift:

274. DHS Secretaries conducted periodic reviews based on consultation with appropriate agencies, including the State Department. Among other things the State Department would provide DHS a fulsome report concerning available and objective evidence of relevant country conditions.

275. DHS Secretaries reviewed objective and reasonably available evidence of country conditions, from the U.S. government and other sources, relating to the basis or bases for the designation—including additional or different conditions from those considered during the initial designation on a given ground but still relevant to that legal ground.

276. Consideration of the Administration's determination of the putative, domestic "national interest" did not feature within periodic reviews.

277. As a result of the shift:

278. Department of State no longer provides fulsome reports of relevant and objective country conditions and does not otherwise equip or support DHS for the purpose of a robust review of all objective and reasonably available evidence of relevant country conditions

279. The scope of country conditions evidence that DHS considers is limited only to the types of conditions relevant at the time of an initial designation on a given ground and is otherwise weighted toward identifying so-called improvements to claim that safe return is possible.

280. Factors supposedly relevant to the domestic "national interest," including but not limited to visa-overstay rates, fraud rates, and supposed security and vetting concerns among the

overall population of nationals from the designated country within the U.S. may now be considered in the course of periodic reviews.

281. These departures from the TPS statute were unreasonable in light of its text and purpose.

282. Defendants' unexplained and unreasonable departures in statutory interpretation and in related agency policies and practices were present in and affected the periodic review of Somalia and resulting Termination, and were arbitrary and capricious in violation of the APA.

283. If the resulting Termination of Somalia's TPS designation is not postponed ahead of its March 17, 2026, effective date and ultimately set aside and vacated, Plaintiffs will suffer irreparable harm.

**COUNT THREE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**Contrary to Law, Arbitrary and Capricious**
*Failure to Consult Appropriate Agencies*
**(All Plaintiffs Against All Defendants)**

284. The TPS statute requires the Secretary to "consul[t] with appropriate agencies of the Government" 8 U.S.C. § 1254a(b)(3)(A).

285. On information and belief, Defendant Noem did not do so.

286. The Termination notice does not refer to any specific agency with which she supposedly undertook statutorily adequate consultation.

287. The Termination notice fails to review objective evidence of ongoing unsafe conditions in Somalia arising out of U.S. Executive Branch sources. Nor does the Termination notice otherwise reflect statutorily adequate review of available and objective evidence during the periodic review process in the form of references or citations to agency materials customarily cited

86

within prior Federal Register notices concerning periodic reviews of Somalia's designation, including State Department human rights reports.

288.    Defendant Noem's failure to undertake statutorily required consultation with appropriate agencies in the course of her periodic review and resultant Termination of Somalia's designation render violates the requirements of the TPS statute, 8 U.S.C. § 1254a(b)(3)(A), and is therefore contrary to law under the APA.

289.    If the resulting Termination is not postponed ahead of its March 17, 2026, effective date and otherwise set aside and vacated, Plaintiffs will suffer irreparable harm.

## COUNT FOUR
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(A)
### Contrary to Law, Arbitrary and Capricious
### *Failure to Undertake Good Faith and Objective Review of Available Evidence of Relevant Country Conditions*
### (All Plaintiffs Against All Defendants)

290.    The TPS statute mandates that in the course of a periodic review of a TPS designation, the DHS Secretary "shall review the conditions  of the foreign state for which a designation is in effect," to determine whether the conditions for a given TPS designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A). Courts have determined this requires an objective assessment. *Saget*, 375 F. Supp. 3d at 346.

291.    Here, Defendant Noem failed to undertake a good faith and objective review of the conditions in Somalia relevant to its armed conflict and extraordinary circumstances grounds for TPS designation, as the TPS statute required her to do.

292.    The Termination notice omits any reference to available and relevant evidence arising from major U.S. Executive Branch sources. Secretary Noem does not acknowledge nor

87

explain why she did not cite these sources as part of her statutorily required objective assessment of relevant conditions.

293.    Instead, the Termination notice reflects that her periodic review of Somalia's designation cherry-picked evidence about areas of Somalia to which she claimed safe return is possible, with respect to the armed conflict designation, and selectively named "improvements" in Somalia's country conditions to undercut the "extraordinary and temporary circumstances" designation. On both fronts, she cited selectively from sources that otherwise contain considerable evidence of ongoing unsafe conditions relevant to Somalia's two designations but failed to review relevant and available objective evidence that demonstrated a contrary conclusion, indicating a preordained and pretextual decision.

294.    Defendant Noem's failure to conduct an objective assessment of relevant country conditions renders her periodic review of Somalia's TPS designation and the resultant Termination violative of the procedural requirements of the TPS statute, 8 U.S.C. § 1254a(b)(3)(A), and contrary to law under the APA.

295.    If the March 17, 2026, effective date of the resulting Termination is not postponed before it takes effect and if the Termination is not ultimately set aside and vacated, Plaintiffs will suffer irreparable harm.

**COUNT FIVE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A), (C)**
**Contrary to Law, Arbitrary and Capricious**
*Consideration of Domestic "National Interest" within TPS Periodic Review, Asserting*
*"National Interest" Rationales Infirm on Their Face, and Departing from the Past Agency*
*Practice of Not Relying on Such Rationales to Terminate a TPS Designation*
**(All Plaintiffs Against All Defendants)**

296.    Periodic reviews and terminations of TPS designations, by statute, may only take into account the country conditions in the foreign state that are relevant to the bases for the TPS designation. 8 U.S.C. §§ 1254a(b)(3)(A), (b)(3)(B). The Administration's determination about the domestic "national interest" is not a statutorily permissible factor within periodic reviews of or terminations of TPS designations.

297.    Here, the Termination notice for Somalia reflects that Defendant Noem's periodic review of Somalia's TPS designation considered factors she explained as relating to domestic "national interest." Her consideration of those factors rendered the periodic review and resulting Termination contrary to the terms of the TPS statute and thus contrary to law under the APA. *See* Oral Order at 20–21, *Dahlia Doe*, 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025), Dkt. 57

298.    Defendant Noem's consideration of the Administration's determination of the domestic "national interest" in her periodic review of Somalia's TPS designation was otherwise arbitrary and capricious because its stated "national interest" rationales are not supported by objective evidence relevant to the designation of Somali TPS. The rationales she offered, including the rate of visa overstays by Somalis writ large within the U.S. and putative vetting and security concerns, included no nexus to the continued *lawful* presence of more than one thousand Somali nationals with TPS in the United States who have been highly vetted and are otherwise subject to strict criteria for maintaining ongoing eligibility for TPS. Nor did the Secretary's offered evidence and justifications that supported the Termination notice's conclusions about "national interest"

89

rationales have any nexus to the question of whether conditions in Somalia relevant to its two grounds for TPS designation allow for safe return—which is the only question within periodic reviews of TPS designations that the TPS statute contemplates.

299.   Additionally, Defendant Noem's termination of Somalia's TPS designation in reliance on putative "national interest" rationales departed from a past agency practice going back three decades under which such rationales were not used as the basis for a termination decision for the extraordinary and temporary circumstances grounds for TPS designation. Defendant Noem's unexplained departure from that past agency practice is arbitrary and capricious and violative of the APA.

300.   If the March 17, 2026, effective date of the Termination of Somalia's TPS designation is not postponed before it takes effect and otherwise set aside and vacated, Plaintiffs will suffer irreparable harm.

**COUNT SIX**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
***Unexplained Departure from Past Agency Practice of Orderly Transition Periods Following***
***Terminations of TPS Designations***
**(All Plaintiffs Against All Defendants)**

301.   Plaintiffs incorporate by reference the above allegations.

302.   To engage in procedurally appropriate decision-making, an agency must "display awareness that it is changing position."[209] Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."[210] The APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[211]

---

[209] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[210] *Id.*
[211] *Id.* at 516.

90

303.    Prior to 2025, including during President Trump's prior term, DHS afforded more orderly transition period of 6 months or longer—and typically 12 to 18 months for TPS terminations, which permitted TPS beneficiaries and their families more time to navigate complex administrative, social, economic, and other realities that may arise from loss of TPS protections.

304.    Defendants' Termination of the TPS designation for Somalia with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures.

305.    Plaintiffs will suffer irreparable injury resulting from the unlawful departure from the prior policy.

306.    Defendants' Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT SEVEN**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
*Contrary to Constitutional Right, Power, Privilege, or Immunity*
**(All Plaintiffs Against All Defendants)**

307.    Plaintiffs incorporate by reference the above allegations.

308.    Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

309.    The Fifth Amendment's Due Process Clause "contains an equal protection component" that prohibits the federal government from invidiously discriminating between individuals or groups.[212]

---

[212] *Washington v. Davis*, 426 U.S. 229, 230 (1976).

310.    Defendants' periodic review and termination of Somalia's TPS designation were impermissibly motivated, at least in part, by intent to discriminate against Somali people based on their race and national origin, as part of Defendants' larger preordained and pretextual aim to terminate TPS protections for African and other non-white or non-European immigrants

311.    Because race and national origin were at least one factor in Defendant's flaw periodic review of Somalia's TPS designation and the resulting Termination, Defendants' Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." *Id.*

312.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

313.    Defendants' Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT EIGHT**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
*Equal Protection Under the Law*
**(All Plaintiffs Against All Defendants)**

314.    Plaintiffs incorporate by reference the above allegations.

315.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a racially discriminatory intent or purpose.[213]  A facially neutral law violates equal protection of the laws when it is the product of intentional discrimination based on race and/or national origin.[214] Discrimination based on race or national origin receives exacting scrutiny.[215] Defendants' periodic review of Somalia's TPS

---

[213] *Id.* at 239.
[214] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252, 265–66 (1977).
[215]  *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) ("The Court has thus far reserved most stringent judicial scrutiny for classifications based on race or national origin.")

designation and decision to terminate it impermissibly and intentionally discriminates against Plaintiffs because of their race and/or national origin.

316. Defendants' own statements and derogatory comments prior to, during, and after the periodic review and Termination categorically slandered Somalis as garbage, criminals, pirates, scammers, and gang members even as they recognized, the crime, lack of governance, and other security issues in Somalia that would support the need for a TPS designation. These statements carry the distinct tone of racist and xenophobic motivations to exclude Somali people from the country. At the same time, the Administration has expressed preferences for white, European immigrants as "nice" and welcome in the U.S and created protections for white Afrikaner refugees from South Africa.

317. The Trump administration's consistent policies and practices of targeting of nonwhite, non-European immigrants and their attempts to terminate TPS based on unjustified narratives of Black and Somali immigrants as taking advantage of the country also support discriminatory intent. Misleading allegations regarding high-profile instances of fraud in state programs in Minnesota, including by individuals of Somali descent, were an explicit catalyst for the Administration's intent to end Somali TPS. This sequence of events divorced demonstrate Defendants clear intent to unfairly target Somali TPS beneficiaries, by tying their ability to benefit from TPS protections related to insecurity in their home countries to unrelated incidents solely because those incidents involve the Somali community. The flawed periodic review process for Somalia "bears more heavily on" the Somali people who are majority Black.

318. In contrast, the Trump administration has left TPS protections for majority-white Ukraine undisturbed and made it easier for white Afrikaners from South Africa to enter the United States under a refugee resettlement program. Defendants' Termination was thus motivated by

intent to discriminate against African and other non-white or non-European immigrants, and Somali people's race and national origin were at least one motivating factor in Defendants' pattern of TPS cancellations, thus violating equal protection of the laws.

319. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination that violated their Fifth Amendment rights under the U.S. Constitution.

320. Defendants' Termination of Somalia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the Defendants' periodic review and resulting termination of Somalia's TPS designation is unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

2. Declare that the decision to provide only 60 days' notice before the termination of TPS for Somalia takes effect is unlawful under the APA;

3. Stay and/or postpone the termination of TPS for Somalia from taking effect or being put into effect, ahead of its March 17, 2026, effective date;

4. Set aside or otherwise vacate the termination of TPS for Somalia as beyond Defendants' authority and/or unlawful under the APA;

5. Under the Fifth Amendment, enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of Somalia's TPS designation; and order Defendants to take all steps necessary to ensure that the TPS designation for Somalia remains in full force and effect unless and until it lawfully expires or is lawfully terminated;

94

6.      Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any

other applicable statute or regulation; and

7.      Award such other and further relief that the Court may deem just, equitable,

and proper.

Dated: March 9, 2026                    Respectfully submitted,

*/s/Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Golnaz Fakhimi (*pro hac vice* forthcoming)
Sadaf Hasan (*pro hac vice* forthcoming)
Collin Poirot (*pro hac vice* forthcoming)
Abbey Rutherford (*pro hac vice* forthcoming)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/Erik Crew*
Erik Crew (*pro hac vice* forthcoming)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/Kacey Mordecai*
Kacey Mordecai (*pro hac vice* forthcoming)
Mide Odunsi (*pro hac vice* forthcoming)
LEGAL DEFENSE FUND
700 14th Street N.W. Suite 600
Washington, D.C. 20005
202.682.1300
Kmordecai@naacpldf.org
Modunsi@naacpldf.org

Morenike Fajana (*pro hac vice* forthcoming)

95

Lauren Carbajal (*pro hac vice* forthcoming)
LEGAL DEFENSE FUND
40 Rector Street #5
New York, NY 10006
202.965.2200
Mfajana@naacpldf.org
Lcarbajal@naacpldf.org

*Counsel for Plaintiffs*

# <u>EXHIBIT 2</u>

**Plaintiffs' Emergency Motion for Administrative Stay Dkt. 3, *African Communities Together, et al. v. Mullin, et al.*, 1:26-cv-11201 (D. Mass. Mar. 9, 2026)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **PLAINTIFFS' NOTICE OF EMERGENCY MOTION FOR ADMINISTRATIVE STAY, PRODUCTION OF THE CERTIFIED ADMINISTRATIVE RECORD, AND POSTPONEMENT OF MARCH 17, 2026, EFFECTIVE DATE OF AGENCY ACTION**<br><br><u>ORAL ARGUMENT REQUESTED</u><br><br>Civil Action No. 1:26-cv-11201<br><br>Pursuant to L. R. 5.1(c), Plaintiffs note they are requesting **emergency relief** against agency action taking effect **at 11:59pm, March 17, 2026,** and leave to proceed pseudonymously. |

PLEASE TAKE NOTICE THAT, on Wednesday, March 11, 2026, or as soon thereafter as this matter may be heard, Plaintiffs move for an administrative stay and ultimately a postponement of agency action under 5 U.S.C. § 705 of the Administrative Procedure Act ("APA").

On January 14, 2026, Defendants issued a decision, 91 Fed. Reg. 1,547 ("Termination"), effective at 11:59pm on March 17, 2026, that will terminate the Temporary Protected Status ("TPS") designation for Somalia, thereby terminating the TPS for all Somali TPS beneficiaries who are lawfully present in the United States under the TPS statute, 8 U.S.C. § 1254a, as of 11:59 p.m. on March 17, 2026. It is estimated that there are currently approximately 1,082 Somali TPS holders in the U.S. and another 1,283 Somali TPS applicants.

Once the Termination is effective, Plaintiffs and other Somali TPS holders and applicants

1

will be subject to the risk of myriad and grave harms, including: (1) immediate loss of immigration status and related access to federal and state benefits; (2) deportation proceedings and related confinement within the U.S.; (3) forced removal to Somalia or other countries where their lives and safety are at risk; (4) forced separation from community members and family in the U.S.; and (5) considerable emotional terror.

To prevent these irreparable harms, Plaintiffs request that the Court act no later than March 16, 2026, to postpone the effective date of the Termination until such time as the Court can resolve in a final order whether the Termination is unlawful. Absent postponement of the effective date, Somali TPS holders and applicants, including the Doe Plaintiffs, will become subject to immigration confinement, deportation, and other adverse consequences, including the risk of fatal harms once the termination is effective as of 11:59pm on March 17, 2026.

Plaintiffs, however, are cognizant that full review of the administrative record will benefit the Court in adjudicating whether emergency postponement of agency action is appropriate under Section 705 of the APA. Accordingly, Plaintiffs respectfully request an administrative stay so that Defendants can produce the administrative record, and the parties may submit supplemental briefing based on that record.

This Notice of Emergency Motion and Emergency Motion is based on a supporting memorandum of law, supporting declarations, and written evidence filed concurrently. Plaintiffs ask the Court to consider the Motion together with its accompanying arguments and evidence; the other pleadings and filings in this case; any additional matter of which the Court may take judicial notice; and such further evidence or argument as may be presented before, at, or after any hearing the Court holds on the motion. Unless otherwise specified, all citations in the memorandum of

law to "Exhibit," "Exhibits," "Ex." or "Exs." refer to exhibits attached to the accompanying

Declaration of Nargis Aslami.

Dated: March 9, 2026                                 Respectfully submitted,

                                                    */s/Nargis Aslami*
                                                    Nargis Aslami (BBO No. 714848)
                                                    Golnaz Fakhimi (*pro hac vice* forthcoming)
                                                    Sadaf Hasan (*pro hac vice* forthcoming)
                                                    Collin Poirot (*pro hac vice* forthcoming)
                                                    Abbey Rutherford (*pro hac vice*
                                                    forthcoming)
                                                    MUSLIM ADVOCATES
                                                    1032 15th Street N.W. #362
                                                    Washington, DC 20005
                                                    (202) 897-2622
                                                    Nargis@muslimadvocates.org
                                                    Golnaz@muslimadvocates.org
                                                    Collin@muslimadvocates.org
                                                    Abbey@muslimadvocates.org

                                                    */s/Erik Crew*
                                                    Erik Crew (*pro hac vice* forthcoming)
                                                    HAITIAN BRIDGE ALLIANCE
                                                    4560 Alvarado Canyon Road, Suite 1H
                                                    San Diego, CA 92120
                                                    (949) 603-7411
                                                    ECrew@haitianbridge.org

                                                    */s/Kacey Mordecai*
                                                    Kacey Mordecai (*pro hac vice* forthcoming)
                                                    Mide Odunsi (*pro hac vice* forthcoming)
                                                    LEGAL DEFENSE FUND
                                                    700 14th Street N.W. Suite 600
                                                    Washington, D.C. 20005
                                                    202.682.1300
                                                    Kmordecai@naacpldf.org
                                                    Modunsi@naacpldf.org

                                                    Morenike Fajana (*pro hac vice* forthcoming)
                                                    Lauren Carbajal (*pro hac vice* forthcoming)
                                                    LEGAL DEFENSE FUND
                                                    40 Rector Street #5

3

New York, NY 10006
202.965.2200
Mfajana@naacpldf.org
Lcarbajal@naacpldf.org

*Counsel for Plaintiffs*

# EXHIBIT 3

**Joint Proposed Schedule**
**Dkt. 35,** *African Communities Together, et al. v. Mullin,*
*et al.*, **1:26-cv-11201 (D. Mass. Mar. 18, 2026)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 1:26-cv-11201-ADB |

**JOINT PROPOSED SCHEDULE**

Pursuant to this Court's Order (Doc. No. 33) requesting the Parties establish a schedule for briefing and production of the administrative record, the Parties have conferred and jointly propose the following schedule:

1. Defendants will produce and file the Certified Administrative Record by Wednesday, April 1, 2026;

2. Plaintiffs will file a supplemental brief in support of their pending Motion for Postponement by Friday, April 10, 2026;

3. Defendants' opposition to Plaintiffs' Motion for Postponement will be due by Friday, April 17, 2026;

4. Plaintiffs' reply in support of their Motion for Postponement will be due by Friday,

April 24, 2026;

5. The parties are available for a hearing on Plaintiffs' Motion for Postponement the week of May 4-8, 2026, or at the Court's earliest convenience.

Dated: March 18, 2026                          Respectfully submitted,

*/s/Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Golnaz Fakhimi (*pro hac vice*)
Sadaf Hasan (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/Kacey Mordecai*
Kacey Mordecai (*pro hac vice*)
Mide Odunsi (*pro hac vice*)
LEGAL DEFENSE FUND
700 14th Street N.W. Suite 600
Washington, D.C. 20005
202.682.1300
Kmordecai@naacpldf.org
Modunsi@naacpldf.org

Morenike Fajana (*pro hac vice*)
Lauren Carbajal (*pro hac vice*)
LEGAL DEFENSE FUND

40 Rector Street #5
New York, NY 10006
202.965.2200
Mfajana@naacpldf.org
Lcarbajal@naacpldf.org

*Counsel for Plaintiffs*

/s/ Robert E. Richardson
Robert E. Richardson
Office of the U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
617.748.3247
Robert.Richardson@usdoj.gov

*Counsel for Defendants*

# <u>EXHIBIT 4</u>

# **Electronic Order Approving Joint Proposed Schedule Dkt. 40,** *African Communities Together, et al. v. Mullin, et al.***, 1:26-cv-11201 (D. Mass. Mar. 19 2026)**

Judge Allison D. Burroughs: ELECTRONIC ORDER entered APPROVING [35] Joint Proposed Schedule. Motion Hearing on Plaintiffs Motion for Postponement set for 5/4/2026 02:00 PM in Courtroom 17 (In person only) before Judge Allison D. Burroughs.)(KF)

# EXHIBIT 5

**Plaintiffs' Motion to Compel Discovery
Dkt. 65,** *African Communities Together, et al. v. Mullin,
et al.***, 1:26-cv-11201 (D. Mass. Apr. 24, 2026)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, et al. <br><br> *Defendants*. | Case No. 1:26-cv-11201-ADB |

**PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

Pursuant to Federal Rule of Civil Procedure 45 and Local Rules 7.1 and 37.1 of the U.S. District Court for the District of Massachusetts, Plaintiffs African Communities Together, Partnership for the Advancement of New Americans, Alexander Doe, Mohamed Doe, Tyson Doe, and Nina Doe (collectively, "Plaintiffs") respectfully move the Court for an order compelling the production of (i) material redacted from the produced record on inapplicable claims of the deliberative process privilege, or in the alternative, that the Court conduct an *in camera* review, and (ii) material redacted from the produced record on inapplicable claims of the law enforcement privilege, or in the alternative, that Defendants produce a privilege log and/or that the Court conduct an *in camera* review.

In support of this motion, Plaintiffs attach:

1. A Memorandum of Law in support of the motion, pursuant to Local Rule 7.1.

2. Memos produced in the cases concerning TPS designations for Afghanistan, Cameroon, Haiti, Honduras, Nepal, Nicaragua, Venezuela, and Syria. (**Ex. A**).

3. Documents contained in the Certified Administrative Record produced on April 1, 2026. Plaintiffs seek fully unredacted versions of:

   a. The Decision Memorandum ("Decision Memo") for the Secretary prepared by United States Citizenship and Immigration Services ("USCIS"), ECF No. 42-1 at AR-000001–16 (**Ex. B**);

   b. An untitled chart and additional text that appears to be related to TPS applicants, ECF No. 42-1 at AR-000278 (**Ex. C**); and

   c. Information regarding TPS specific data, ECF No. 42-1 at AR-000290 (**Ex. D**).

4. Correspondence between counsel for the Parties related to Plaintiffs' request for unredacted copies of the documents. (**Ex. E**).

Dated: April 24, 2026                            Respectfully submitted,


*/s/ Nargis Aslami*                              */s/ Ashley Burrell*
Nargis Aslami (MA Bar Number: 714848)            Ashley Burrell*
Melissa Keaney**                                 Lauren Carbajal*
Collin Poirot*                                   NAACP LEGAL DEFENSE AND
Abbey Rutherford*                                EDUCATIONAL FUND, INC.
MUSLIM ADVOCATES                                 40 Rector Street, 5th Floor
1032 15th Street N.W. #362,                      New York, NY 10006
Washington, D.C. 20005                           202.965.2200
202.897.2622                                     aburrell@naacpldf.org
Nargis@muslimadvocates.org                       lcarbajal@naacpldf.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org                        Kacey Mordecai*
                                                 Mide Odunsi*
*/s/ Erik Crew*                                  NAACP LEGAL DEFENSE AND
Erik Crew*                                       EDUCATIONAL FUND, INC.
HAITIAN BRIDGE ALLIANCE                          700 14th Street N.W., Suite 600

<table>
<tr><td>4560 Alvarado Canyon Road, Suite 1H</td><td>Washington, D.C. 20005</td></tr>
<tr><td>San Diego, CA 92120</td><td>202.682.1300</td></tr>
<tr><td>(949) 603-7411</td><td>kmordecai@naacpldf.org</td></tr>
<tr><td>ecrew@haitianbridge.org</td><td>modunsi@naacpldf.org</td></tr>
</table>

*Counsel for Plaintiffs*
\*Admitted *pro hac vice*
\*\**Pro hac vice* forthcoming

## LOCAL RULE 7.1 CERTIFICATION

I certify that counsel for Plaintiffs conferred with counsel for Defendants, who oppose the relief requested in this motion. The parties have attempted in good faith to narrow and/or resolve the issues raised in this Motion to Compel pursuant to Local Rules 7.1(a)(2) and 37.1(a), and Federal Rule of Civil Procedure 37(a)(1). Notwithstanding the foregoing efforts, the disputed issues are not resolved, giving proper cause to submit this Motion to Compel.

/s/ Ashley Burrell
Ashley Burrell

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2026, this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF).

/s/ Ashley Burrell
Ashley Burrell

# EXHIBIT 6

## Electronic Order Requesting Parties Advise on Stay Pending *Mullin*
## Dkt. 70, *African Communities Together, et al. v. Mullin, et al.*, 1:26-cv-11201 (D. Mass. Apr. 29, 2026)

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. The parties shall advise the Court by 12:00 p.m. on Friday, May 1, if they oppose a stay of this litigation pending a decision of the Supreme Court in Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084. (CAM)

# EXHIBIT 7

**Plaintiffs' Letter in Support of Stay**
**Dkt. 71, *African Communities Together, et al. v. Mullin,***
***et al.*, 1:26-cv-11201 (D. Mass. Apr. 30, 2026)**

April 30, 2026

U.S. District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

**Re: African Communities Together v. Noem, 1:26-cv-11201 (D. Mass.)**

Dear Judge Burroughs:

As requested by the Court's order on April 29, 2026, Dkt. 70, Plaintiffs file this letter in support of staying proceedings in this matter provided that the current administrative stay of the challenged action remains in place during the pendency of the stay of proceedings.

The Parties conferred via email and telephone conference on Thursday, April 30, 2026. Plaintiffs communicated that they did not oppose a stay of the litigation so long as the current administrative stay remains in place. Defendants do not oppose a stay. Plaintiffs further propose that the Parties submit a joint status report within fourteen (14) days of the Supreme Court's ruling, addressing their respective positions regarding appropriate next steps in this litigation, including a proposed briefing schedule with a new hearing date on Plaintiffs' Motion for Postponement.

The Plaintiffs respectfully request that this Court issue an order staying these proceedings and indicating that the current relief remains in place pending further order from this Court.

Dated: April 30, 2026　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　*/s/Nargis Aslami*
　　　　　　　　　　　　　　　　　Nargis Aslami (BBO No. 714848)
　　　　　　　　　　　　　　　　　Sadaf Hasan (*pro hac vice*)
　　　　　　　　　　　　　　　　　Melissa Keaney (*pro hac vice*)
　　　　　　　　　　　　　　　　　Collin Poirot (*pro hac vice*)
　　　　　　　　　　　　　　　　　Abbey Rutherford (*pro hac vice*)
　　　　　　　　　　　　　　　　　MUSLIM ADVOCATES

1

1032 15th Street N.W. #362
Washington, DC 20005
(202) 897-2622
Nargis@muslimadvocates.org
Sadaf@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*/s/Kacey Mordecai*
Kacey Mordecai (*pro hac vice*)
Mide Odunsi (*pro hac vice*)
Odunsi (*pro hac vice*)
LEGAL DEFENSE FUND
700 14th Street N.W. Suite 600
Washington, D.C. 20005
202.682.1300
kmordecai@naacpldf.org
modunsi@naacpldf.org

Ashley Burrell (*pro hac vice*)
Lauren Carbajal (*pro hac vice*)
LEGAL DEFENSE FUND
40 Rector Street #5
New York, NY 10006
202.965.2200
aburrell@naacpldf.org
lcarbajal@naacpldf.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

2

I hereby certify that a true copy of the above document was served upon the attorneys of record by means of the Court's Electronic Case Filing system on April 30, 2026.

/s/ Nargis Aslami
Nargis Aslami
MUSLIM ADVOCATES
*Counsel for Plaintiffs*

# EXHIBIT 8

**Defendants' Response Stating Non-opposition to Stay Dkt. 72, *African Communities Together, et al. v. Mullin, et al.*, 1:26-cv-11201 (D. Mass. May 1, 2026)**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,

                Plaintiffs,

    v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*, et al.,

                Defendants.

Case No. 26-cv-11201-ADB

## RESPONSE TO COURT ORDER

Pursuant to the Court's Order of April 29, 2026, the Defendants respectfully advise the Court that they do *not* oppose a stay of this litigation pending a decision of the Supreme Court in Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: May 1, 2026          By:    */s/ Robert E. Richardson*
                                ROBERT E. RICHARDSON
                                Assistant United States Attorney
                                U.S. Attorney's Office
                                1 Courthouse Way, Ste. 9200
                                Boston, MA 02210
                                (617) 748-3247
                                robert.richardson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

   I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

           */s/ Robert E. Richardson*
           ROBERT E. RICHARDSON
           Assistant U.S. Attorney

# EXHIBIT 9

# Electronic Order for Stay & Joint Status Report
# Dkt. 73, *African Communities Together, et al. v. Mullin, et al.*, 1:26-cv-11201 (D. Mass. May 1, 2026)

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Both parties have indicated that they do not oppose staying this action until the Supreme Court has issued an opinion in Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084. See [ECF Nos. [71], [72]]. Pursuant to the Court's "inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention," Marquis v. F.D.I.C., 965 F.2d 1148, 1154 (1st Cir. 1992)(collecting cases), and in light of the fact that the question at issue in this case "will, in all likelihood, turn upon [the Supreme Court's decision in a recently argued case]," Marshel v. AFW Fabric Corp., 552 F.2d 471, 472 (2d Cir. 1977) (per curiam), this action is STAYED until the Supreme Court has issued a decision in Doe and Miot.

The Court further accepts Plaintiffs' proposal, see [ECF No. [71] at 1], and ORDERS the parties to file a joint status report within fourteen days of the Supreme Court's decision in those cases. The status report should set forth the parties' positions on appropriate next steps in the litigation, including a proposed briefing schedule with a new hearing date on Plaintiffs' motion for postponement.

Until the Court orders otherwise, the administrative stay, [ECF No. [33]], will remain in place. (CAM)